[Cite as *BND Rentals, Inc. v. Dayton Power & Light Co.*, 2020-Ohio-4484.]


**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**


|  |  |  |
|---|---|---|
| BND RENTALS, INC. | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28543 |
| | : | |
| | : | Trial Court Case No. 2018-CV-4511 |
| v. | : | |
| | : | (Civil Appeal from |
| DAYTON POWER & LIGHT CO. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellee | : | |


. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of September, 2020.

. . . . . . . . . . .

RONALD J. KOZAR, Atty. Reg. No. 0041903, 40 North Main Street, Suite 2830, Dayton, Ohio 45423
        Attorney for Plaintiff-Appellant

JAMES PAPAKIRK, Atty. Reg. No. 0063862, and BENJAMIN M. RODRIGUEZ, Atty. Reg. No. 0079289, 50 East Business Way, Suite 410, Cincinnati, Ohio 45241
        Attorneys for Defendant-Appellee

. . . . . . . . . . . . .


WELBAUM, J.

{¶ 1} Plaintiff-Appellant, BND Rentals, Inc. ("BND"), appeals from a summary judgment rendered in favor of Defendant-Appellee, Dayton Power and Light Company ("DP&L"). According to BND, the trial court erred in granting summary judgment to DP&L and in denying BND's motion for summary judgment. Specifically, BND contends that the trial court erred in requiring BND to have a contractual relationship with DP&L in order to file a mechanic's lien on DP&L's property. BND further contends that it satisfied the remaining requirements for recovering under its lien filing, and the court, instead, should have rendered summary judgment in its favor.

{¶ 2} We agree that the trial court erred in concluding that BND had to have a contractual relationship with DP&L in order to recover under the mechanic's lien statutes. As a party who furnished equipment used to complete the contract, BND have could potentially qualified to file a lien under R.C. 1311.02. However, the court's error was immaterial because the removal of items on DP&L's property by BND did not fit within the definition of an "improvement" in R.C. 1311.01(J). BND therefore could not file a mechanic's lien because it did not furnish equipment used to remove an improvement. And there are no genuine issues of material fact on this point. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In 2006, DP&L closed its Hutchings Generating Station ("Hutchings"), which was a coal-fired electric power plant located in Miamisburg, Ohio. Under the terms of an October 2016 written agreement, DP&L sold certain equipment ("steam turbine and

generator units and associated equipment") that remained at the Hutchings to General Recovery Recycling, LLC ("GRR"), which intended to sell at least some of the equipment as scrap. The turbine and generator units themselves consisted of three or four rounded metal structures, "about twenty feet high and at least as wide," located inside a building on the Hutchings property, along with other "collateral" equipment attached to those structures. BND's Motion for Summary Judgment, attached Affidavit of Terry Grooms ("Grooms Affidavit"), ¶ 4.

{¶ 4} Under the agreement, GRR purchased the equipment "WHERE IS," and title passed to GRR upon payment of its initial deposit to DP&L. DP&L's Answer and Counterclaim, Ex. A, "Purchase and Sale Agreement", ¶ 4 and 6. The agreement further provided that GRR was "responsible for all activities and costs associated with safely dismantling, packing and loading" the equipment for removal from the Hutchings site. *Id.* at ¶ 5.

{¶ 5} Additionally, under the agreement, GRR was to "cover, seal with and bolt down steel plate covers over on [sic] any openings created by or the result of the removal of [the] equipment," and DP&L was to receive 85 percent of any amounts realized from the subsequent re-sale of such equipment for scrap. *Id.* at ¶ 18.

{¶ 6} In November 2016, GRR hired Zenith Industrial Demolition, LLC ("Zenith") to remove the purchased items from the Hutchings site. Zenith then rented various equipment from Vandalia Rentals, a company BND operated, for use in removing these items. In applying to Vandalia Rentals for a credit extension for the rental costs, Zenith identified DP&L's Hutchings site as the sole location where the rental equipment would be used. *See* BND's Motion for Summary Judgment, attached Affidavit of Sandy Roller

("Roller Affidavit"), ¶ 3, and Ex. A to the affidavit.

{¶ 7} Because BND had no direct contract with either DP&L or GRR, BND sought to protect its interest in the rental fees by providing DP&L with a "notice of furnishing" in accordance with Ohio's mechanic's lien statutes. *See* R.C. 1311.05(A). To that end, BND asked DPL to forward a copy of DP&L's statutory "notice of commencement" for the removal project. However, on November 17, 2016, DP&L responded that the mechanic's lien statutes did not apply to the GRR transaction. The reason given was that GRR was "not making any improvements to the property, only simply removing equipment." DP&L Answer and Counterclaim, Ex. B, attached email from Tim Kappers to Sandy Roller, p. 1.

{¶ 8} Subsequently, in May 2017, when unpaid invoices for the rental equipment totaled $120,308.75, BND filed an affidavit for a mechanic's lien on DP&L's real property at the Hutchings site. BND's Motion for Summary Judgment, Roller Affidavit at ¶ 5, and Ex. C to the affidavit. In response, DP&L filed an application to provide a bond to "substitute as a security" for BND's lien. *See Dayton Power & Light Co. v. BND Rentals, Inc.*, Montgomery C.P. No. 2018 CV 03699, August 10, 2018 "Unopposed Application for Approval of Bond Pursuant to R.C. 1311.11." An agreed entry was then filed on August 13, 2018, approving the bond. The bond remains active pending resolution of the case before us.

{¶ 9} After the bond was approved, BND filed the complaint in this case, seeking judgment in the amount of $120,308.75 against the bond that DP&L had posted. DP&L filed an answer and counterclaim, asking that BND's claims be dismissed, that BND's mechanic's lien be declared invalid, that the bond be released, and that DP&L be awarded

attorneys' fees and costs it incurred in defending BND's action. On July 19, 2019, both parties filed motions for summary judgment.

{¶ 10} On September 27, 2019, the trial court issued a decision granting DP&L's motion for summary judgment, denying BND's motion for summary judgment, and entering judgment in favor of DP&L. *See* Decision, Order and Entry Granting Defendant's Motion for Summary Judgment * * *("Order"). In its decision, the trial court held that the agreement between DP&L and GRR "was a contract for the purchase and sale of equipment, nothing more." Order at p. 13. The court's decision to grant summary judgment rested primarily on two additional findings: 1) that "at the time of removal, GRR was the owner of the equipment, not DP&L"; and 2) that "GRR's purchase of the equipment from DP&L did not create any agency relationship between the two parties," meaning that "GRR was not acting as an agent of DP&L when it contracted with Zenith for the removal of the equipment from the [Hutchings] property." *Id.* at p. 10 and 11-12.

{¶ 11} Because the court found that no form of contractual relationship existed between BND and DP&L, it declined to decide "whether the removal of the equipment from the property constituted an improvement for purposes of the mechanic's lien statute." *Id.* at p. 8, fn.5. In addition, the court held that DP&L was entitled to judgment as a matter of law because Vandalia Rentals' contract with Zenith had no connection to DP&L.

{¶ 12} BND has timely appealed from the trial court's judgment.

## II. Was Summary Judgment for DP&L Warranted?

{¶ 13} On appeal, BND has presented the following assignments of error:

The trial court erred in granting DP&L's motion for summary judgment; and,

The trial court erred in denying BND's motion for summary judgment.

{¶ 14} Because these assignments of error are related, we will consider them together. BND's first contention is that the trial court erred in holding that R.C. 1311.02 requires contractual privity between an owner and a party filing a lien. According to BND, its mechanic's lien against the Hutchings property was valid because BND was a supplier who provided "materials" (rental equipment) used by a "subcontractor" (Zenith) in furtherance of "improvements" (removal of turbines and generators) to DP&L's Hutchings site. According to BND, this satisfied the requirements in R.C. 1311.02 for filing mechanic's liens and, as a result, the trial court erred in concluding that BND's lien was invalid and, therefore, in granting judgment in DP&L's favor.

{¶ 15} "A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999), citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 375 N.E.2d 46 (1978).

{¶ 16} "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). As a result, appellate courts do not defer to trial courts during summary judgment review.

*Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.), citing *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

{¶ 17} Concerning mechanic's liens, R.C. 1311.02 provides that:

> Every person who performs work or labor upon or furnishes material in furtherance of any improvement undertaken by virtue of a contract, express or implied, with the owner, part owner, or lessee of any interest in real estate, or the owner's, part owner's, or lessee's authorized agent, *and every person who as a subcontractor, laborer, or material supplier, performs any labor or work or furnishes any material to an original contractor or any subcontractor, in carrying forward, performing, or completing any improvement,* has a lien to secure the payment therefor upon the improvement and all interests that the owner, part owner, or lessee may have or subsequently acquire in the land or leasehold to which the improvement was made or removed.

(Emphasis added.)

{¶ 18} In view of the statute's wording, the trial court erred in confining itself to deciding whether a contract existed between DP&L and BND. R.C. 1311.02 does not restrict its application to those who have a direct contractual relationship with an owner. Instead, the emphasized part of the statute also allows liens to be filed by persons like BND, who furnish materials to original contractors and subcontractors.

{¶ 19} In this regard, R.C. 1311.01 contains the following definitions, quoted in pertinent part:

> (D) "Subcontractor" includes *any person* who undertakes to * * *

*remove, * * * any part of any improvement* under *a contract with any person other than the owner*, part owner, or lessee.

(E) "Original contractor," * * * includes a construction manager *and any person* who undertakes to * * * *remove* * * * *any part of any improvement under a contract with an owner,* part owner*, or lessee*.

\* \* \*

(I) "Materials" means all products and substances including, without limitation, * * * *machinery furnished in furtherance of an improvement*.

{¶ 20} Based on the statutory language, which is both broad and clear, GRR fit the definition of "contractor," Zenith fit the definition of a "subcontractor," and BND fit the definition of a person who provides materials – assuming that the work involved also was an "improvement."   As noted, this was an issue the trial court declined to consider.

{¶ 21} Notably, the statutes do not require a particular form of contract; they simply refer to "a contract."   R.C. 1311.02; R.C. 1311.02(D) and (E).   Thus, whether the agreement was designated as a "sales/purchase" agreement or any another other type of contract was irrelevant.   The real issue in this case was whether the removal of the objects in question constituted an "improvement."

{¶ 22} Under R.C. 1311.01(J), an "improvement" is defined, in relevant part, to include "removing any building or appurtenance thereto, fixture, bridge, or other structure * * *."   Based on this statute, removal of the equipment at Hutchings would be considered an "improvement" only if these items could be considered buildings or appurtenances thereto, fixtures, or other structures.

{¶ 23} Considering the fixture issue first, the Supreme Court of Ohio noted in 1853

that ambiguities existed in the law surrounding fixtures. The court, therefore, concluded that:

> [T]he united application of the following requisites will be found the safest criterion of a fixture.
>
> 1st. Actual annexation to the realty, or something appurtenant thereto.
>
> 2d. Appropriation to the use or purpose of that part of the realty with which it is connected.
>
> 3d. The intention of the party making the annexation, to make the article a permanent accession to the freehold – this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made.

*Teaff v. Hewitt*, 1 Ohio St. 511, 529–30 (1853).

{¶ 24} *Teaff* involved competing claims of lien creditors and whether property should be classified as real or personal for purposes of their priority. *Id.* at 512. The main discussion in the case was about the law pertaining generally to fixtures. The court discussed how the term "fixture" had been used differently in various situations. *Id.* at 523-527. However, rather than indicating that ambiguity must therefore exist, the court's aim in *Teaff* was to examine the authorities and "extract from them the most uniform, reasonable and consistent principle, as a standard by which a fixture can always be determined." *Id.* at 527. As a result, a general test was constructed, which was applicable not just to particular situations, but in all cases involving fixtures.

{¶ 25} Subsequently, in 1945, the Supreme Court of Ohio approved and followed *Teaff* in *Zangerle v. Republic Steel Corp.*, 144 Ohio St. 529, 60 N.E.2d 170 (1945). In *Republic Steel*, the court reviewed a decision of the Board of Tax Appeals, which found that "machinery and equipment of various sizes and various weights ranging from 750 pounds to almost 950 tons" should be assessed as personal property rather than being part of the real property. *Id*. at 530 and 533. The reason for the dispute was that if the equipment were classified as personal property, the corporation's tax would be less. *Id*. at 533-534. Relying heavily on *Teaff,* the court affirmed the Board's decision. In addition to approving and following the three-part test that *Teaff* had outlined, the court added that:

> The general principle to be kept in view in determining whether what was once a chattel has become a fixture is the distinction between the business which is carried on in or upon the premises, and the premises. The former is personal in its nature, and articles that are merely accessory to the business, and have been put on the premises for this purpose, and not as accessions to the real estate, retain the personal character of the principal to which they belong and are subservient. But articles which have been annexed to the premises as accessory to it, whatever business may be carried on upon it, and not peculiarly for the benefit of a present business which may be of a temporary duration, become subservient to the realty and acquire and retain its legal character.

*Republic Steel* at paragraph seven of the syllabus.

{¶ 26} Another decision by the Supreme Court of Ohio was issued earlier in 1945.

That case also considered *Teaff* in detail and discussed each part of the test. As to the first prong (attachment), the court commented that "the weight of authority seems to be that, while slight attachment to realty may be sufficient to give a chattel the character of a fixture, *provided the other requisites of a fixture are present*, as a general rule to give it such character it must be so attached that it loses its identity as a chattel or that it cannot be removed without injury to itself or to the freehold, apart from the reduced value of the freehold, apart from the straction of the thing removed." (Emphasis added.) *Zangerle v. Std. Oil Co. of Ohio*, 144 Ohio St. 506, 514, 60 N.E.2d 52 (1945).

{¶ 27} Concerning the factor of relationship to the realty, the court stated that:

The second requisite of the test of a fixture is that the annexed chattel must have such relationship to the land or improvements already constructed thereon as to be necessary or beneficial to its enjoyment, independent of the business presently carried on. To illustrate, a silo constructed on a farm is a fixture (*Concrete Silo Co. v. Warstler*, 50 Ohio App. 334, 198 N.E. 189); a heating furnance [sic] installed in a residence property is a fixture (*Holland Furnace Co. v. Trumbull Savings & Loan Co.*, 135 Ohio St. 48, 19 N.E.2d 273); and motive-power equipment in a mill is likewise a fixture. *Teaff v. Hewitt*, supra. Those are fixtures because they would be beneficial, if not necessary, to the use of the land and the structures already placed thereon regardless of the nature of the business which might be located on such land.

For the purposes of classification of annexed property as realty or personalty, the Ohio cases, herein cited, have clearly drawn a fundamental

distinction between annexations which would be integrated with and of permanent benefit to the land *regardless of its future use*, such as a heating furnace, motive-power machinery, water systems, drainage and sewer systems, *accessory to the land and not to the business carried on*; and annexations of special-purpose, manufacturing or processing machinery and structures which could be used only in a particular business or industry and not in any normal use to which the land might be devoted, and hence accessory to the business in which they function and not accessory to the land. *The decisive test of appropriation is whether the chattel under consideration in any case is devoted primarily to the business conducted on the premises, or whether it is devoted primarily to the use of the land upon which the business is conducted.*

(Emphasis added; citation omitted.) *Id.* at 515-16.

{¶ 28} Finally, regarding the third *Teaff* factor, which involves the annexing party's intention to make a chattel a permanent accession, the court stressed that this does not involve a secret or subjective purpose. Instead, "[i]ntention to permanently attach must be inferred from all the surrounding circumstances which can be objectively observed." *Id.* at 518. Furthermore, a presumption against annexation of chattels exists. *Id.*, citing *Teaff*.

{¶ 29} In a 2004 decision, the Supreme Court of Ohio noted that it had followed the analysis in *Republic Steel* and *Standard Oil Co.* in tax cases "until 1949, when it dropped consideration of whether the land or the business was benefited by the item in question and instead considered only the wording of G.C. 5322, the precursor to R.C.

5701.02, which provided: 'The terms "real property" and "land" as so used, include not only land itself * * * but also, unless otherwise specified, all buildings, structures, improvements, and fixtures of whatever kind * * * thereon * * *.' " *Funtime, Inc. v. Wilkins*, 105 Ohio St.3d 74, 2004-Ohio-6890, 822 N.E.2d 781, ¶ 14, quoting Am.S.B. No. 63, 115 Ohio Laws, Part II, 272. The court further observed that in these cases, "[b]y looking only at R.C. 5701.02 and a description of the item, the court abandoned any consideration of whether the item was being used to benefit the business on the land or the land itself." *Id.* at ¶ 16, discussing *Thomas Steel Strip Corp. v. Limbach*, 61 Ohio St.3d 340, 341, 575 N.E.2d 114 (1991).

{¶ 30} The court went on to note, however, that in 1992, the legislature amended R.C. 5701.02 and R.C. 5701.03 in order " 'to revise the definitions of real and personal property for taxation purposes.' " *Funtime* at ¶ 17, quoting Sub.S.B. No. 272, 144 Ohio Laws, Part I, 1528. At that point, the legislature defined "the terms 'building,' 'structure,' 'improvement,' and 'fixture,' and also added the new term, 'business fixture,' in R.C. 5701.03." *Id.* at ¶ 18-19.

{¶ 31} Under R.C. 5701.03 as amended, " 'Business fixture' means an item of tangible personal property that has become permanently attached or affixed to the land or to a building, structure, or improvement, and that primarily benefits the business conducted by the occupant on the premises and not the realty. 'Business fixture' includes, but is not limited to, machinery, equipment, signs, storage bins and tanks, whether above or below ground, and broadcasting, transportation, transmission, and distribution systems, whether above or below ground." R.C. 5701.03(B). Under the amended statute, business fixtures were designated as "personal property," not real

property.   *See* R.C. 5701.03(A).

{¶ 32} After noting the amendments, the court commented in *Funtime* that:

Although we previously abandoned any consideration of the appropriation-to-use test set forth in *Teaff*, 1 Ohio St. 511, 1853 WL 54, for classifying property, the General Assembly has reinstated that test for determining whether a structure is real or personal property.   R.C. 5701.02(E) requires a decision as to whether the item "increases or enhances utilization or enjoyment of the land."   Language similar to that now found in R.C. 5701.02(E) was used by this court in *Zangerle* [*v. Std. Oil Co.*], 144 Ohio St. at 515, 30 O.O. 151, 60 N.E.2d 52, wherein we stated:

"The second requisite of the test of a fixture [real property] is that the annexed chattel must have such relationship to the land or improvements already constructed thereon as to be necessary or beneficial to its enjoyment, independent of the business presently carried on. * * *"

This concept was concisely set forth in paragraph four of the syllabus in [*Std. Oil Co.*[1]]: "The decisive test of appropriation is whether the chattel under consideration in any case is devoted primarily to the business conducted on the premises, or whether it is devoted primarily to the use of the land upon which the business is conducted."   [*Std. Oil Co.*], 144 Ohio St. 506, 30 O.O. 151, 60 N.E.2d 52, paragraph four of the syllabus.

The concepts regarding the appropriation-to-use test set forth in

---

[1] Zangerle, a county auditor, is the plaintiff in more than one case that we discuss herein. For clarity, we have changed some of the names by which cases are addressed, using the defendant's name.

*Zangerle v. Std. Oil of Ohio* were reiterated by the court in *Zangerle v. Republic Steel Corp.* (1945), 144 Ohio St. 529, 30 O.O. 160, 60 N.E.2d 170, paragraph seven of the syllabus, in which the court held:

"The general principle to be kept in view in determining whether what was once a chattel has become a fixture is the distinction between the business which is carried on in or upon the premises, and the premises. The former is personal in its nature, and articles that are merely accessory to the business, and have been put on the premises for this purpose, and not as accessions to the real estate, retain the personal character of the principal to which they belong and are subservient. But articles which have been annexed to the premises as accessory to it, whatever business may be carried on upon it, and not peculiarly for the benefit of a present business which may be of a temporary duration, become subservient to the realty and acquire and retain its legal character."

*Funtime,* 105 Ohio St.3d 74, 2004-Ohio-6890, 822 N.E.2d 781, at ¶ 36-40.

{¶ 33} Thus, after the 1992 amendments, the tests previously used in *Teaff*, *Republic Steel*, and *Standard Oil Co.* were reinstated. More recently, the Supreme Court of Ohio has held that grain storage bins are personal property under the business fixtures definition in R.C. 5701.03(B). *Metamora Elevator Co. v. Fulton Cty. Bd. of Revision,* 143 Ohio St.3d 359, 2015-Ohio-2807, 37 N.E.3d 1223, ¶ 22.

{¶ 34} The above decisions, other than *Teaff*, are in the area of taxation, which involves some different considerations than mechanic's liens. For example, in tax situations, owners are likely attempting to minimize tax liability. Property taxes are also

constitutionally based. *See* Oh. Const. Art. XII, Section 2. In contrast, owners in mechanic's liens situations are trying to avoid a legal mechanism that may impair their ability to transfer property or may provide creditors an easier way to recover for the owners' debts. Mechanic's liens are also statutorily based. In addition, the law of mechanic's liens does not specifically define either "business fixtures" or "fixtures."

{¶ 35} Nonetheless, based on the court's comments in *Funtime*, it is clear that the common law test for fixtures established in *Teaff* and its progeny was altered only because of specific statutory provisions relating to taxation. It was not altered for other types of cases. Consistent with this conclusion, before and after the 1992 amendments to the taxation statutes, courts have applied *Teaff* and its progeny to cases that do not involve taxation.

{¶ 36} For example, our district has previously applied *Teaff* in nontaxation cases. *See, e.g., Household Fin. Corp. v. BancOhio*, 62 Ohio App.3d 691, 694, 577 N.E.2d 405 (2d Dist.1989) (determining that a furnace installed in a home was a fixture); *Lacy v. White*, 2d Dist. Champaign No. 97-CA-4, 1997 WL 770155, *2 (Dec. 12, 1997) (affirming a trial court judgment that a reverse osmosis drinking water system in a home was a fixture). Other districts have done so as well. *E.g., Rickett v. Ohio Real Estate Appraiser Bd.*, 10th Dist. Franklin No. 07AP-667, 2008-Ohio-3169, ¶ 34 (trial court properly used traditional common law test for fixtures as set out in *Teaff* to decide if a real estate appraiser could properly have classified a mobile home as real property); *Wheeler v. Martin*, 4th Dist. Washington No. 04CA15, 2004-Ohio-6936, ¶ 18 (noting *Teaff* test in case involving whether an above-ground swimming pool was a fixture).

{¶ 37} In a post-1992 product liability case, the Supreme Court of Ohio applied

*Teaff* in finding that an item in a plant that caused injury was personal property and not a fixture. As a result, the corporation could be sued on a product liability claim. *See Wireman v. Keneco Distribs., Inc.*, 75 Ohio St.3d 103, 106, 661 N.E.2d 744 (1996).

{¶ 38} Applying the above standards here, nothing in the record indicates that the equipment at DP&L's site was anything other than something designed to be used as an accessory to DP&L's business. No evidence was presented indicating that the equipment was something to be used for the land or to enhance the land itself, in the absence of the business operations.

{¶ 39} While the record does not discuss the equipment in detail, other than the contract's reference to "steam turbine and generator units and associated equipment," nothing in the record reveals that these items would be useful to the land, rather than to DP&L's business. DP&L's Answer and Counterclaim, Ex. A, Sale and Purchase Agreement at ¶ 1.

{¶ 40} Depositions were taken and likewise did not support a conclusion that the equipment was part of the real property rather than an accessory to DP&L's business. Terry Grooms, the BND salesman who rented the equipment to Zenith, testified that while he had visited the DP&L premises six to ten times, he never talked to anyone from DP&L. Grooms Deposition, p. 23-24, and 28. Grooms also never spoke to anyone from GRR. *Id.* at p. 52. Grooms understood Zenith wanted to use BND's equipment "to assist in harvesting scrap metal and other materials." *Id.* at p. 23. However, he did not know the names of the things that Zenith was working on; he just knew Zenith was "removing copper from extremely large pieces." *Id.* at p. 25.

{¶ 41} In an affidavit filed in connection with BND's motion for summary judgment

and signed a few days after his deposition was taken, Grooms stated that he had visited the DP&L site. He described the items being removed as follows:

> The work that I saw Zenith's people doing while using BND's equipment was not the removal of personal belongings that were simply sitting on the floor. Rather, the work mainly involved the disassembly of at least three or four giant, rounded, metal structures, about twenty feet high and at least as wide, that were lined up in a row inside an enormous indoor space. All of the other fixtures and equipment I saw positioned near these giant structures appeared to be attached to or centered around these structures, giving the impression that these giant structures were somehow the main feature or were central to the functioning of the plant. When I first visited the site and entered the building, I saw all of these structures, which appeared to be intact. Over the course of later visits, I saw these giant structures and collateral fixtures that were attached to or connected to them, in states of progressive disassembly, starting with the one nearest the doorway and continuing over time down the row. By the time of my last visit, the buildings that had encased these structures were still standing but were empty, and the walls and surrounding areas that had been occupied were far more barren.

BND's Motion for Summary Judgment, Grooms's Affidavit at ¶ 4.

{¶ 42} Michael Weaver, BND's finance manager, was told by Zenith that DP&L had unneeded turbines that were being removed. Weaver Deposition, p. 5 and 52-53. Sandy Hooker, who worked in accounts receivable at BND, did not know what

improvements BND's materials were provided in connection with, nor did she know what was being removed. Hooker only knew that Zenith was either demolishing or removing items from the property. Hooker Deposition, p. 6, 11, and 56-57.

{¶ 43} Thus, in the evidentiary materials before the trial court, there was simply no evidence that the equipment being removed was anything other than something that was "devoted primarily to the business conducted on the premises," *Std. Oil Co.*, 144 Ohio St. 506, 60 N.E.2d 52, at paragraph four of the syllabus. Even considering Grooms's affidavit, it did not bear on the issues; the affidavit only revealed that large equipment was removed. Furthermore, the assertion that the removed items were "*central to the functioning* of the *plant*" only supported the conclusion that they were an accessory to the business, not something that would benefit the realty.

{¶ 44} Accordingly, because the equipment was not "devoted primarily to the use of the land upon which the business [was] conducted," it did not satisfy the requirements for being considered a fixture.

{¶ 45} R.C. 1311.02(J) also mentions appurtenances, by referring to "removing any building or appurtenance thereto." Consequently, a lien could be allowable if the items in question were considered appurtenances. *In Mid-Ohio Mechanical, Inc. v. Carden Metal Fabricators, Inc.*,169 Ohio App.3d 225, 2006-Ohio-5293, 862 N.E.2d 543 (5th Dist.), the court commented, in a mechanic's lien situation, that:

> The Revised Code does not define "appurtenance." Black's Law Dictionary defines an appurtenance as "that which belongs to something else; an adjunct; an appendage. Something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of

way or other easement to land; an outhouse, barn, garden, or orchard, to a house or messuage.[2] * * * An article adapted to the use of the property to which it is connected, and which was intended to be a permanent accession to the freehold. A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another." Citation omitted. Black's Law Dictionary (5th Ed.1979) 94. (Footnote added.) *Mid-Ohio Mechanical* at ¶ 33.

{¶ 46} Again, the same issue arises here as it did with the issue of whether fixtures are personal or real property. Something that is "intended to be a permanent accession to the freehold" or that is "by right used by the land for its benefit" is consistent with the factors dictating a finding that an object is part of the realty rather than personal property. In fact, appurtenances have also been equated with fixtures for purposes of property transfers. *See Szilagy v. Taylor*, 63 Ohio App. 105, 106, 25 N.E.2d 360 (9th Dist.1939) ("Things pass as incidents to or appurtenances of realty when they are attached thereto and are essential to its use; in other words, when they are fixtures.")

{¶ 47} *Szilagy* involved a dispute between adjoining landowners, where part of a building encroached on the other property. *Id*. at 105. In holding that one owner did not improperly remove the part of his building from the property on which it encroached, the court applied the *Teaff* test, even though it did not refer to it by name. *Id*. at 106. In

---

[2] A messuage is a term derived from Middle English, and means a premise, i.e., a house with adjacent lands and buildings. *See* Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/messuage, accessed July 31, 2020.

this regard, the court concluded that he building was not intended to be attached permanently (the prior owner had intended to demolish it).   *Id.*

**{¶ 48}** While there is not a great deal of caselaw relating to appurtenances, other existing authority also indicates that the DP&L equipment was not an appurtenance to the Hutchings facility.   *E.g., State ex rel. Walter v. Vogel*, 169 Ohio St. 368, 159 N.E.2d 892 (1959), syllabus ("Lighting systems for urban portions of 'limited access highways' (as defined in Section 5535.02, Revised Code) are appurtenances thereto."); *Terry v. Kellstone, Inc.*, 6th Dist. Erie No. E-12-061, 2013-Ohio-4419, ¶ 34-35 (limestone stockpile was not an appurtenance because it was not attached to the land); *Paul v. First Nat. Bank of Cincinnati*, 52 Ohio Misc. 77, 85, 369 N.E.2d 488 (C.P.1976) (items taken by heirs must be returned to seller because items were "necessarily connected with the use and enjoyment of [the] country estate" that seller purchased).

**{¶ 49}** The final potentially relevant term included in R.C. 1311.01(J) is "other structure," which is preceded by a specific list of other objects like fixtures and buildings. Under the doctrine of ejusdem generis, " 'whenever words of general meaning follow the enumeration of a particular class, then the general words are to be construed as limited to those things which pertain to the particularly enumerated class.' "   *Cincinnati City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 122 Ohio St.3d 557, 2009-Ohio-3628, 913 N.E.2d 421, ¶ 20, quoting *Akron Home Med. Servs., Inc. v. Lindley*, 25 Ohio St.3d 107, 109, 495 N.E.2d 417 (1986).   Because the enumerated class in R.C. 1311.01(J) refers to items considered part of an owner's real property, inclusion of the term "other structures" does not provide a basis for including the Hutchings equipment within the meaning of "improvements."

{¶ 50} In light of the preceding discussion, there are no genuine issues of material fact concerning whether the removal of equipment at the Hutchings site was an improvement as defined in R.C. 1311.01(J). The equipment was not a fixture, appurtenance, or other structure, and BND, therefore, was not entitled to place a lien on DP&L's property.

{¶ 51} As a final matter, we note that, on appeal, BND relies on three cases that allegedly support the claim that DP&L's equipment was part of the realty rather than personal property. *See* BND Brief, p. 6. We will briefly address these cases.

{¶ 52} In *Mid-Ohio Mechanical*, the court of appeals did conclude, after applying *Teaff*, that a paint line in a factory which was being remodeled was not personal property and was subject to a subcontractor's lien. *Mid-Ohio Mechanical*, 169 Ohio App.3d 225, 2006-Ohio-5293, 862 N.E.2d 543, at ¶ 35.

{¶ 53} As an initial point, *Mid-Ohio Mechanical* is distinguishable because it concerned a typical mechanic's lien situation: (1) a company desiring remodel of its property; (2) contracts with a contractor, who then; (3) contracts with a subcontractor; (4) who then contracts with another party to either work on the site or furnish materials. *Id.* at ¶ 5-7. The party filing the lien in *Mid-Ohio Mechanical* was both a subcontractor of the contractor and one who furnished materials to another subcontractor. *Id.* at ¶ 6-7.

{¶ 54} More importantly, however, the court in *Mid-Ohio Mechanical* misapplied the part of the test which asks whether the property in question relates to the owner's business use or to the realty's purpose. In this vein, the court of appeals stated that:

> Regarding whether it is essential to the use or purpose of the realty,
>
> Eisenmann [the owner] argues the paint line is personal property because

it is related to the owner's current business and is not essential to the use or purpose of the realty.   Here, the paint line is integrated into the factory. Again, under Eisenmann's analysis, this argument could be extended to the entire building, because the factory is devoted to a particular business, and could be demolished and the real estate used for some other purpose.

*Id.* at ¶ 27.

{¶ 55} If this logic were followed, there would never be a situation in which personal property would retain its character and not be considered an improvement.   Specifically, all businesses can be demolished, and the land can then be used for other purposes.

{¶ 56} The second case cited on appeal is *Tri-State Crane Rental, Inc. v. Watson Gravel, Inc.*, 1st Dist. Hamilton Nos. C-030392, C-030408, C-030424, 2004-Ohio-1262. In *Tri-State Crane*, the owner contracted for "the sale, design and construction of a clamshell dredge.   The dredge constructed was approximately 40 feet high, 30 feet wide, and 70 feet long, and it weighed in excess of 100 tons. The dredge was made of steel and had pontoons that allowed it to float on the pond in a gravel pit.   The dredge was not self-propelled, but moved about the water by winches and cables that attached the dredge to the shoreline.   The clamshell lifted aggregate from the pit and transferred it to a series of floating conveyors attached to the dredge that moved the aggregate to the shoreline. In order to remove the dredge from the gravel pit, it had to be dismantled and hauled away.   Though the parties could not reach an agreement on how many man-hours it would take to dismantle the dredge, the trial court found that it would have taken 'enormous human effort.' "   *Id.* at ¶ 2.

{¶ 57} In *Tri-State Crane*, the contractor hired a subcontractor, who in turn

contracted with two other parties for use of equipment. *Id.* at ¶ 3. As in the case before us, the subcontractor did not pay for the equipment, and the parties both filed liens. *Id.* Again, this was a typical mechanic's lien situation, where the owner was paying for improvements to the property; the owner was not selling personal property for disposal. However, as previously stressed, the pertinent issue is not specifically whether a "typical" lien situation exists. Rather, the issue is whether the item in question falls within the meaning of an "improvement" as defined by statute.

{¶ 58} In *Tri-State Crane*, the court considered whether the dredge was a "structure," which is one of the permissible types of improvements under the statute. In doing so, the court used the ordinary meaning of structure. *Id.* at ¶ 7. The court then concluded that the dredge was a structure. *Id.* There is little analysis in the case, but the court of appeals did cite two Ohio cases as support for its conclusion. *Id.* at ¶ 8, fn. 4, citing *Kings Entertainment Co. v. Limbach*, 63 Ohio St.3d 369, 588 N.E.2d 777 (1992), and *Monday Villas Property Owners Assn. v. Barbe*, 75 Ohio App.3d 167, 169, 598 N.E.2d 1291 (2d Dist.1991).

{¶ 59} *Kings*, however, was decided during the period in which the Supreme Court of Ohio had rejected the test used in *Teaff* and its progeny. *See Kings* at 370 (rejecting this test). In fact, the outcome in *Kings* would not have been possible under *Funtime*, 105 Ohio St.3d 74, 2004-Ohio-6890, 822 N.E.2d 781.

{¶ 60} Specifically, the court held in *Kings* that construction of rides at Kings Island Amusement Park, as "structures" and "improvements," were part of the real property for tax purposes. *Kings* at 370. In *Funtime,* the Supreme Court of Ohio held the opposite regarding rides constructed at Geauga Lake Amusement Park. The court found that the

rides were not "structures" under R.C. 5701.02 as amended in 1992, but were "business fixtures" under R.C. 5701.03 as amended in 1992. *Funtime* at ¶ 41-42.

**{¶ 61}** *Monday Villas* was a decision from our court and involved an alleged violation of condominium restrictions that occurred when the defendant installed antennas for use in his ham radio operations. *Monday Villas,* 75 Ohio App.3d at 169, 598 N.E.2d 1291. The trial court ordered the defendant to remove the antennas, and he appealed. *Id.* Our discussion was brief, but we noted the trial court had relied on out-of-state case law constructing the word "structure" broadly, as well as case law looking at the circumstances surrounding the parties' intent and purpose in restricting free use of property. *Id.* at 170. This decision is not on point here, or perhaps even in *Tri-State*.

**{¶ 62}** The third case BND cites in its appellate brief is *Argo Constr. Co. v. Kroger Ltd. Partnership I*, 12th Dist. Clinton No. CA2008-09-036, 2009-Ohio-2811. In that case, Kroger hired a contractor to build a Kroger store, and the contractor hired a subcontractor. The subcontractor then rented equipment from the plaintiff. *Id.* at ¶ 2. Again, this was a typical mechanic's lien situation. Furthermore, nothing in *Argo* is pertinent to the case before us, as it does not discuss whether the construction was an "improvement." It would be hard to argue that the project was not an improvement or a structure, as Kroger was building a new store. The only issues in the case were whether the lien was valid, because the plaintiff filed the lien after the deadline for doing so, and whether the trial court erred in overruling the plaintiff's Civ.R. 60(B) motion, which addressed a point that did not concern the lien. *Id.* at ¶ 9 and 31.

**{¶ 63}** Because these three cases are either irrelevant or use legal authority that has been rejected, they do not impact the decision of whether or not summary judgment

for DP&L was appropriate.

**{¶ 64}** As indicated, the trial court erred in awarding summary judgment based on the absence of a contractual relationship between BND and DP&L.   However, summary judgment for DP&L was warranted, because removal of the equipment at Hutchings was not an improvement within the meaning of R.C. 1311.01(J).   The law is well established that "[a]n appellate court may affirm based on different reasoning than found by a trial court, but an appellate court cannot disturb a judgment or order that is legally correct based on different reasoning."   *John A. Becker Co. v. Jedson Eng., Inc.*, 2018-Ohio-3924, 121 N.E.3d 788, ¶ 19 (2d Dist.), citing *State ex rel. Sommers v. Perkins Local Schools Bd. of Edn.*, 2017-Ohio-7991, 98 N.E.3d 1117, ¶ 26 (6th Dist.).

**{¶ 65}** "The fundamental questions in an appeal are, one, whether the appealed decision itself is erroneous and, two, whether that error is prejudicial. A decision that achieves the right result must be affirmed, even if the wrong reasoning is used to justify the decision, because an error in reasoning is not prejudicial."   *Id.*, citing *Sommers* at ¶ 26.   (Other citation omitted). Accordingly, because the decision granting summary judgment to DP&L was correct, although based on incorrect reasoning, BND's two assignments of error are overruled.


## III.   Conclusion

**{¶ 66}** The trial court's reason for awarding summary judgment to DP&L was incorrect, but the error was not prejudicial because summary judgment on DP&L's behalf was appropriate.   As a result, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J., concurs:

{¶ 67} I agree wholeheartedly with Judge Welbaum's analysis and conclusions. I write separately to emphasize that, in my opinion, the agreement between DP&L and GRR was fundamentally different than a contract between a landowner who hires a contractor to perform compensable work to, for, or on the owner's property, which is what is contemplated by the lien statutes. I therefore agree with the trial court's conclusion that the DP&L and GRR agreement "was a contract for the purchase and sale of equipment, nothing more."

{¶ 68} DP&L sold, and GRR bought, "the steam turbine and generator units and associated equipment" located inside DP&L's former Hutchings Station generating plant. Notably, DP&L did not hire GRR or pay GRR to remove the equipment. GRR purchased and paid DP&L for its purchase of the equipment. The contract was a "Purchase and Sale Agreement," which stated: "Title and risk of loss to the Equipment shall pass to Buyer upon payment of the Initial Deposit." Consequently, the equipment became GRR's personal property located on DP&L's real property at the very beginning. The contract indicated that the Buyer, GRR, was responsible for all costs associated with dismantling or removing the equipment, but there was no indication that DP&L was paying or hiring GRR to remove anything. To the contrary, GRR paid DP&L. The contract's conditions included removal of GRR's personal property in a timely manner and that title of the property would revert to DP&L if GRR did not remove the property by June 30, 2017, some seven months after the initiation of the contract. In my opinion, that terminology was ancillary to the purpose of the contract for sale and did not convert that contract into a contract for "removal."

{¶ 69} The manner in which construction or property "improvement" contracts work is that an owner hires a contractor, who hires subcontractors, who may rent tools for the job. But the job being paid for by the owner is for the benefit of the owner. And, because the owner is hiring someone to perform the job, one can reasonably conclude that the job is for an improvement of the owner's property. In that scenario, the owner protects himself or herself by allowing access to draws or periodic payments that are released when it is demonstrated that potential lien claimants have been paid or have released their lien rights. Here, there was no payment from the owner that the owner could withhold to protect against potential liens from materialmen or suppliers. Here, the job that Zenith was to perform, and for which Zenith rented tools from BND, was the job for the benefit of GRR to remove GRR's personal property from DP&L's land. The size of the personal property was not a controlling factor. It could have been a railroad locomotive, even one affixed to the ground to keep it from moving. But when sold as is and where is, it was still personalty.  Furthermore, in my opinion, just because the DP&L-GRR sale agreement had terms relating to when GRR was to remove GRR's property from DP&L's building did not make the agreement one for the "removal" of the property. Therefore, the "removal" terminology of R.C. 1311.01(J), and the statute itself, did not apply.

{¶ 70} I also agree that the steam turbines were not an "appurtenance" or "fixture" as described in R.C. 1311.01(J). In my opinion, the question of whether the turbines were an "appurtenance" or "fixture" under the facts of this case was a legal one, not one with material issues of fact, because the facts surrounding what was involved were undisputed. The equipment here was not "used with the land for its [the land's] benefit." The equipment was used for the business' benefit. That was particularly true when this

business equipment, despite its size, was legally separate and distinct from the land by the sale of the equipment, but not the land, and ownership of the equipment resided in the purchaser upon initiation of the contract.

{¶ 71} Finally, I recognize that the entire analysis may be different if the DP&L and GRR agreement were shown to be a subterfuge or contortion intended to misrepresent the nature of an improvement contract between a landowner and a contractor. But there was no evidence or contention that the purchase agreement of personalty here was either. Moreover, BND was specifically informed at the beginning that DP&L denied that this was a "lienable" project, yet BND did nothing to secure a lien on the value in the transaction, GRR's personalty, the steam turbines themselves.

{¶ 72} I concur.


FROELICH, J., dissents:

{¶ 73} I agree than an appellate court may affirm on different reasoning than that utilized by a trial court, but only if that different reasoning is based on facts established in the trial court. I disagree that, as a matter of law, the agreement between DP&L and GRR "was a contract for the purchase and sale of equipment, *nothing more*." (Emphasis added.) Order at p. 13.

{¶ 74} Neither the DP&L/GRR contract's characterization as a "Purchase and Sale Agreement" nor its provision for the removal of large structures from DP&L's real property was dispositive, as a matter of law, of the "improvement" issue. Under the current version of R.C. 1311.02, an "improvement" to real property is defined to include "altering, repairing, demolishing, or removing any building or appurtenance thereto, fixture, bridge,

or other structure," R.C. 1311.01(J), and "subcontractor" is defined to include "any person who undertakes" the foregoing actions "under a contract with any person other than the owner * * *" of the subject real property. R.C. 1311.01(D).

{¶ 75} The statute does not provide definitions for the terms "appurtenance" or "fixture." *See id.* However, according to the Supreme Court of Ohio:

> A fixture is an article which was a chattel, but which by being physically annexed or affixed to the realty, became accessory to it and part and parcel of it. But the precise point in the connection with the realty, where the article loses the legal qualities of a chattel and acquires those of the realty, often presents a question of great nicety and sometimes difficult determination.

*Wireman v. Keneco Distribs., Inc.,* 75 Ohio St.3d 103, 106, 661 N.E.2d 744 (1996), citing *Teaff,* 1 Ohio St. 511.

{¶ 76} Here, a factual question of possibly "difficult determination" remains as to whether the turbine and generator equipment constituted "fixtures," *see id.*, and if so, whether their "removal" qualified as an "improvement" to DP&L's real property – an issue the trial court explicitly declined to address. *See* Order at p. 8, fn.5).

{¶ 77} While I do not necessarily accept BND's proposal that *any* removal of a fixture or an appurtenance from real property qualifies per se as an "improvement" for purposes of the mechanic's lien statute simply because such removal work is included within the statutory definition, I believe a genuine issue of material fact exists as to whether the removal of the subject equipment qualified as an improvement to DP&L's real property.

{¶ 78} In light of that unresolved issue of material fact, I would reverse the entry

granting summary judgment in favor of DP&L, affirm the denial of BND's motion for summary judgment, and remand this matter for further proceedings.

Copies sent to:

Ronald J. Kozar
James Papakirk
Benjamin M. Rodriguez
Hon. E. Gerald Parker, Jr.