[Cite as *Verbillion v. Enon Sand & Gravel, L.L.C.*, 2021-Ohio-3850.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| MICHAEL E. VERBILLION, et al. | : | |
| | : | |
| Plaintiffs-Appellees | : | Appellate Case No. 2021-CA-1 |
| | : | |
| v. | : | Trial Court Case Nos. 2018-CV-519 |
| | : | |
| ENON SAND AND GRAVEL, LLC | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 29th day of October, 2021.

. . . . . . . . . .

BRIAN P. BARGER, Atty. Reg. No. 0018908 and MATTHEW D. HARPER, Atty. Reg. No. 0059192, One SeaGate, 24th Floor, P.O. Box 10032, Toledo, Ohio 43699
   Attorneys for Plaintiffs-Appellees

PAUL J. KAVANAGH, Atty. Reg. No. 0065418, 333 North Limestone Street, P.O. Box 1687, Springfield, Ohio 45501
   Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** This case involves whether a prior, non-conforming use for surface mining exists on property owned by Defendant-Appellant, Enon Sand and Gravel, LLC ("Enon"). The trial court concluded that it does not, and that Enon must obtain a conditional use permit to engage in surface mining. Enon appeals from the trial court's judgment, which was rendered in favor of Plaintiffs-Appellees, Michael Verbillion, Jolyn Verbillion, Beth Zainey, Carol Culbertson, and Charles Swaney (collectively, "Appellees").

**{¶ 2}** In support of its appeal, Enon raises six assignments of error, including whether the trial court erred: (1) in failing to apply res judicata to Appellees' claims; (2) in failing to find that Appellees' action impermissibly attacked a prior federal court judgment; (3) in finding that Appellees had standing under R.C. 303.24 to bring this action; (4) in excluding the testimony of a deceased witness; (5) by finding that Enon failed to prove a prior legal nonconforming use to engage in surface mining on its property; and (6) by concluding that Enon's predecessors-in-interest had abandoned a prior non-conforming use on certain parts of the property.

**{¶ 3}** After considering the record, we find no error, other than harmless error, on the trial court's part. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 4}** In 2004, Melvin Stone Company ("Melvin") purchased Enon, which is a business supplying construction, asphalt, and concrete aggregates. Transcript of

Proceedings ("Tr."), p. 477-478.[1]   Enon is located just north of Enon, Ohio.   *Id.* at p. 478. Dennis Garrison is the president of Enon and of several other aggregate companies affiliated with Jurgensen Company.   *Id.* at 511.   Since becoming president of the Jurgensen aggregates in 2002, Garrison has acquired many properties for the purpose of engaging in surface mining.   *Id.* at p. 479 and 512.   Surface mining encompasses any type of mining that starts on the earth's surface.   Typically, sand and gravel are mined by mechanical means, whether above water or under water, while limestone is mined by blasting followed by mechanical extraction.   *Id.* at p. 480.

{¶ 5} After learning that Daniel Demmy was attempting to market property in Clark County that might have extensive mineral reserves, Garrison signed a letter of intent in August 2014 for Melvin to purchase 500 acres from Demmy, Demmy's wife, and their associated entities.   *Id.* at p. 482-483, 492, and 513-514.   Garrison had known Demmy since the 1990s, as both a customer and a competitor.   *Id.* at 486-487.

{¶ 6} For purposes of simplifying the process with the Clark County Auditor, 17 parcels were combined into five parcels, which were later labeled as Demmy I, II, and III, and Keifer I and II.   *Id.* at p. 492, 494, 519, and 522   The property in question was zoned agricultural, and unless a prior lawful non-conforming use existed, Clark County would require Enon to obtain a conditional use permit before engaging in surface mining.   *Id.* at p. 517-518.

{¶ 7} Specifically, Clark County's Zoning Resolution ("CCZR"), which was adopted in November 1964, allowed exemption from the conditional use process if a property was

---

[1] There are three volumes of transcripts, but we will simply refer to the transcript pages, since the pages are numbered consecutively.

subject to a prior lawful non-conforming use before the CCZR was enacted. *Id.* at p. 154, 164, 394-395, and 524; Joint Ex. I, Ch.9, Section (G)(1)(h), p. 9-8. If a prior lawful non-conforming use exists, it extends to the full extent of a parcel at the time of approval, regardless of where the non-conforming use is located on the parcel. Tr. at p. 164. However, if the non-conforming use is voluntarily discontinued for two years or more, any future uses much comply with the CCZR. CCZR at Ch. 9, Section (G)(3)(a), p. 9-9.

{¶ 8} Under the August 2014 letter of intent, Melvin's obligation to close on the property was conditioned on confirmation that no zoning or other land use restrictions would limit, impair, or prevent Melvin's ability to mine the property's mineral deposits. Tr. at p. 516.

{¶ 9} As part of the sale process, Garrison engaged in due diligence, which included the following items: inquiring how the property had been used in the past; reviewing all the Ohio Department of Natural Resource ("ODNR") records; walking the property; evaluating ten to twelve core drills Demmy had done to ascertain the types, depths, and amounts of limestone on the property; looking at areas Demmy had mined in the past and what reclamation had been done; reviewing the potential mine plan for the property at that time; doing environmental studies; reviewing zoning and the conditional use process; checking for property liens; and determining if prior lawful nonconforming mining uses existed on the property. *Id.* at p. 483-484 and 515-517. Over the years, extensive parts of the property had been mined for sand, gravel, and limestone, including sand and gravel mining on Demmy II, Demmy III (an option parcel), and Keifer II, and sand, gravel, and limestone mining on Keifer I and Demmy I. *Id.* at p. 484-486.

A.  The Mining Permit Process for the Property

{¶ 10} In addition to complying with zoning laws, surface mine operators must comply with surface mine laws.  Ohio's surface mine statute was enacted in 1975 and currently requires pre-existing mine sites not covered by a mining reclamation plan to apply for a mining permit with the Division of Mineral Resources Management ("DMRM"), which is a division of ODNR.[2]  This Division, as part of the ODNR, has authority over all surface mining in Ohio.  *See* R.C. 1501.01, R.C. 1501.05, R.C. 1514.011, and R.C. 1514.02.

{¶ 11} Under R.C. 1514.02, applications for permits for surface mining are made to the Chief of the DMRM.  The Reclamation Commission hears appeals from the Chief's orders, and aggrieved parties are permitted to appeal from the Commission's decisions to the common pleas court.  *See* R.C. 1514.09, R.C. 1515.13, and 1513.14(A).

{¶ 12} Properties in southwest Ohio had their first permits issued in the summer of 1976.  The reclamation law is equivalent to a construction bond that ensures owners will reclaim mining areas.  Tr. at p. 339-340.  Issuance of a mining permit under R.C. Chap. 1514 does not relieve mine owners or operators from complying with any other federal, state or local requirements, including zoning regulations.  In fact, applicants for mining permits must state that they will comply with zoning laws.  However, they do not have to apply for a zoning permit before obtaining a mining permit.  *Id.* at p. 359 and 361-362.

{¶ 13} ODNR/DMRM also regulates the impact of surface mining on water and

---

[2] The original permits for the subject property were issued by the ODNR, Division of Reclamation.  *See* Ex. 43.  In 2007, the DMRM was created and became responsible for surface mining and issuing permits. *See* Sub.H.B. 443, 2006 Ohio Laws File 196. This change is irrelevant for purposes of the present case.

wells, as well as all blasting issues, including the manner of blasting and the requirement of approval of a blasting. *Id.* at p. 388 and 390. The fire marshal and/or federal government may regulate storage of blasting materials. *Id.* at p. 388.

{¶ 14} ODNR, through the Reclamation Division, initially issued two mining permits relative to the property in question. Tr. at p. 338. This was because, at the time, different individuals owned parts of the property. One, permit IM-375, was issued effective June 6, 1977, to Demmy Sand & Gravel and initially covered 156.8 acres. Ex. C, p. 6.[3] This permit covered Demmy I, II, and III, and allowed the applicant and its later successors to mine anywhere on the permitted properties. Tr. at p. 364-366; Ex. 42-A; and Ex. B-1.

{¶ 15} Furthermore, including all the acreage in an application indicates an applicant's intent to mine all the property either at the present time or in the future. *Id.* at p. 366 (testimony of Richard Pennington, ODNR Reclamation Inspector). In the mining industry, the term "reserves" refers to the remaining sand or aggregate or other minerals remaining to be extracted. *Id.* at p. 366. "Holding in reserve" is a standard part of mining operations and refers to mining companies' acquisition of acreage exceeding what they can presently mine. Holding property in reserve is necessary for profitable operations because mining, by its nature, exhausts the available resources as it proceeds. *Id.* at p. 366-367.

---

[3] Enon's exhibits in this case use letters and Appellees' exhibits use numbers. To avoid unnecessary clutter, we will refer only to letters or numbers when referencing exhibits. Ex. C is a certified copy of the Reclamation Commission's Findings, Conclusions, and Order that were issued on July 25, 2018 in the consolidated matters of *CAM-Mad River Township, et al v. Division of Mineral Resources Management and Enon Sand & Gravel, LLC*, Case Nos. RC0-17-004, RC-17-005, and RC-17006. The trial court admitted this document, which was offered by Enon. Tr. at p. 586.

{¶ 16} Although permit IM-375 was not issued until 1977, some mining had already occurred on the site. Between 1977 and 2015, permit IM-375 was amended to both increase and decrease its size. At the most recent permit renewal in 2007, IM-375 covered 398.9 acres. Ex. C at p. 6.

{¶ 17} In 2015, Enon acquired title to Demmy I and Demmy II and acquired an option to purchase Demmy III. Subsequently, in December 2015, Demmy Sand & Gravel transferred permit IM-375 to Enon. Ex. C at p. 6. "At the time of the 2015 transfer of permit IM-375 to Enon, only 18.8 acres of the permitted 398.8 acre area had actually been affected. Thus, very little excavation had occurred on the permit IM-375 area, and the land was being used primarily for agricultural purposes." Id.

{¶ 18} As noted, two mining permits are relevant to this case. ODNR issued the second permit, IM-340, on April 27, 1977, to William Keifer. Tr. at p. 338, 351-352, 369 and 374; Ex. 28-A; Ex. 43; Ex. B-1; and Ex. C, p. 5. The original permit covered about 13.8 acres. Ex. C at p. 5.

{¶ 19} Although this permit was not issued until 1977, "mining had been occurring on this site for many years." Id. "Between 1977 and 2015, permit IM-340 was: (1) amended to add 8.0 acres; (2) modified to allow blasting; (3) modified to increase mining depth and to allow quarry dewatering; and (4) transferred from Keifer Sand & Gravel to Demmy Construction, Inc. In December 2015, Demmy Construction, Inc. transferred permit IM-340 to Enon." Id. "At the time of the 2015 transfer to Enon, permit IM-340 covered 21.8 acres from which sand & gravel, and a limited amount of limestone, had already been extracted. Quarry lakes remain[ed] on the original 21.8 acre of permit IM-340." Id. at p. 6.

{¶ 20} After acquiring the two permits, Enon submitted three applications to the DMRM in 2016 and 2017, seeking to combine the permits into one (IM-340), for a total of 420.6 acres, to increase the allowable depth of blasting, and to revise the existing blasting plan. *Id.* On July 13, 2017, the Chief of DMRM approved the three applications and modified the 340 Permit to: (1) consolidate the 340 Permit and the 375 Permit into one permit governing all the property previously governed by the two permits separately; and (2) allow the use of explosives and dewatering to surface mine for minerals, specifically limestone. *See* Ex. C. at p. 7, 22-25, 27, and 32.

{¶ 21} Some parties to the present case (Charles Swaney and Michael Verbillion), were among those who appealed to the Reclamation Commission from the orders granting Enon's permit to surface mine. Another appellant before the Commission was a local non-profit organization known as Citizens Against Surface Mining – Mad River Township ("CAM"). Ex. C at p. 3. At the time, Carol Culbertson and Michael Verbillion were on CAM's Board of Directors, and Swaney was CAM's director. *Id.* at p. 4-5. Enon was an intervenor in the administrative appeal.

{¶ 22} Swaney, Verbillion, and CAM filed a notice of appeal from the Chief's three decisions on August 7, 2017, and the appeals were consolidated on November 1, 2017, for hearing and decision. *Id.* at p. 1-2. Previously, on August 17, 2017, Enon had been given permission to intervene. *Id.* at p. 2. The Reclamation Commission then held hearings for four days in April 2018 and an additional day in May 2018, during which the parties presented evidence and witnesses and were able to examine each other's witnesses. *Id.*

{¶ 23} The witnesses at the hearing included landowners in the permit area who

were also members of CAM.   These individuals included Culbertson, Michael Verbillion, Swaney, Jon Vanderglass, and Kyle Peterson.   *Id.* at p. 3-5 and 28-29.   Other witnesses for the appellants, among others, included David Crow, DMRM's Chief Deputy, and Brett Huntsman, a hydrogeologist, who had prepared a 23-page report.   Ex. C at p. 17 and 32; Index, Witnesses, p. 1-2, and Index, Exhibit W.   DMRM's witnesses included Crow; DMRM staff geologist Kelly Barrett, an expert in hydrology, geology, and ground water modeling; and Michael Mann, a DMRM blasting expert.   Ex. C at p. 17 and 27, and Index, Witnesses, at p. 2.   Finally, Enon's witnesses included Stephen Champa, a hydrologist with Eagen & Associates, and Dennis Garrison, Enon's president.   Ex. C at p. 15, 18, and 24.

{¶ 24} After considering the evidence, the Commission issued an order on July 25, 2018, finding that Enon had complied with all statutory requirements associated with amending and modifying Permit IM-340, including adding acreage, increasing the depth of mining and allowing dewatering operations, and updating and revising the blasting plan.   Therefore, the Commission affirmed the Chief's decision.   Ex. C at p. 33.

{¶ 25} Although the appellants were advised of their right to appeal to the common pleas court from the Commission's decision, there is no evidence that any appeal was taken.   *Id.* at p. 33, citing R.C. 1514.09, R.C. 1513.14, and Ohio Adm.Code 1515-3-22. Where a party fails to appeal from the decision of the Reclamation Commission, both claim preclusion and issue preclusion or collateral estoppel apply if the party has had an ample opportunity to litigate before the commission.   *Combs v. Oxford Mining Co.*, 5th Dist. Tuscarawas No. 2018 AP 05 0022, 2020-Ohio-876, ¶ 24-42.

## B. Public Meetings and Federal Litigation

{¶ 26} In 2017 and into 2018, public hearings also occurred in Clark County and federal court litigation. Since very early in the process, Clark County was aware of public opposition to Enon's proposed mining operation. The first public meeting occurred in 2017 and was scheduled by the Township Trustees. Tr. at p. 170. Over 200 people came and raised a lot of concerns. *Id.* Thomas Hale, the Greene County Zoning Administrator, Allen Neimeyer, the Senior Planner for Clark County Community and Economic Development, and other Clark County staff also attended. *Id.* at p. 171.

{¶ 27} On May 1, 2017, Neimeyer wrote a letter to Enon, indicating that a conditional use permit was needed. This was based on a parcel to the north of the subject property and was merely an informational letter. Tr. at p. 39 and 540-541; Ex. WWW; and Ex. 49. Enon did not appeal from this letter. Tr. at p. 455.[4] However, Enon did file a complaint in federal court on July 13, 2017 against the Clark County Board of Commissioners ("Board") and Hale, in his capacity as the Clark County Zoning Administrator. Tr. at p. 494 and Ex. MMM, *Enon Sand and Gravel, LLC v. Clark County Bd. of Comm.*, S.D.Ohio No. 3-17-cv-00324 (Complaint).

{¶ 28} The federal complaint involved Demmy I, II, and III and Keifer I and II, and

---

[4] Hale, Clark County's Zoning Administrator, and Neimeyer, the Senior Planner, both took the position that the letter was "merely an informational letter," was not an order, and was not subject to an appeal to the Board of Zoning Appeals. Tr. at p. 397 and 455; Hale Deposition, p. 33-34, attached as Ex. O to Enon's Reply Memorandum in Support of Summary Judgment; and Ex. 48 (Neimeyer Deposition), p. 43 and 47. In federal litigation, however, the Board took inconsistent positions, contending both that it had taken no action that would deprive Enon of a property right and that Enon had the ability to oppose the county's " '*determination* that mining is not a legal nonconforming use by appealing that determination to the BZA.' " (Emphasis sic.) Ex. QQQ, *Enon Sand and Gravel, LLC v. Clark County Bd. of Comm.*, S.D.Ohio No. 3-17-cv-00324, Report and Recommendations (May 5, 2018), p. 8, quoting the Board's Reply Memorandum, p. 311.

asked for a declaratory judgment that these properties had valid prior non-conforming uses which extended to all surface mining uses of the properties, including holding them in reserve for future surface mining for minerals and using them for incidental purposes necessary to surface mining. Enon further asked for a declaration that it could continue these prior non-conforming uses on the properties without a conditional use permit and that neither the nature of the minerals mined nor Enon's method of mining invalidated the valid prior non-conforming uses of the properties for surfacing mining uses. Ex. MMM at p. 7-15. The complaint also asserted a constitutional claim for deprivation of property rights and asked for preliminary and permanent injunctions. *Id.* at p. 15-16.

{¶ 29} On October 3, 2017, Swaney (who was an attorney) filed a one-page motion to intervene in the federal action; Enon then filed a response opposing the motion to intervene. Ex. LLL, p. 4-5 and Ex. QQQ at p. 17. Both Swaney and Enon then filed additional memoranda concerning the motion to intervene. Ex. LLL at p. 5. In November 2017, the Board and Hale filed a motion for judgment on the pleadings, and in December 2017, the federal court referred the matter to a magistrate. *Id.* at p. 5-6. The court also set a trial date for November 26, 2018. *Id.* at p. 7.

{¶ 30} In May 2018, the federal magistrate granted the motion for judgment on the pleadings in part and denied it in part, and also denied Swaney's motion to intervene. *Id.* at p. 12. Both the Board and Hale filed objections to the magistrate's decision, but Swaney did not. *Id.* at p. 12-13. Subsequently, in late July 2018, the court referred the case to a magistrate solely for purposes of conducting a mediation, which was held in September 2018. *Id.* at p. 16. In the meantime, the court adopted the magistrate's decision in part, solely with respect to the denial of Swaney's motion to intervene. *Id.* at

p. 14. The court's decision further noted that by the parties' agreement, a decision on the objections was stayed pending mediation. *See* Ex. H attached to the Summary Judgment Motion Enon filed in the case before us.

{¶ 31} During mediation, the parties settled the case and entered into a settlement agreement. At the time the settlement agreement was made, the Board was aware of public opposition to the mining operation. Tr. at p. 171. On October 10, 2018, the Board voted to accept the agreement, and a stipulated judgment of dismissal was filed in the federal case on October 17, 2018. *Id.* at p. 173, 414, 400, and 501, and Ex. KKK, p. 90, Ex. SSS, and Ex. TTT.

{¶ 32} Among other things, the parties agreed that "surface mining constitutes and remains a prior, legal non-conforming use ('the Non-Conforming Use') of the Demmy and Keifer Parcels protected and permitted to continue under Ohio law notwithstanding the CCZR." Ex. SSS, p. 3. In addition, the agreement provided for payment of $25,000 by the Board to Enon. *Id.* at p. 4. However, the agreement also stated that:

> The Parties agree that, if the Settlement Agreement cannot be implemented or enforced due to some form of citizen action or some form of action taken by the County, the Settlement Agreement shall be deemed null and void and Plaintiff shall be entitled to have its claims revived and the dismissal of the Litigation vacated. In the event that the claims are revived, Plaintiff will reimburse the $25,000 payment made pursuant to Paragraph 2 above to Defendant within fourteen (14) days from the date in which Plaintiff moves to revive said claims.

Ex. SSS at p. 5.

### C. State Court Litigation

{¶ 33} On October 10, 2018 (the same day the Board approved the settlement agreement and before the federal case had been dismissed), Appellees filed the present action against Enon. The action was brought by five plaintiffs – Michael Verbillion, Jolyn Verbillion, Beth Zainey, Carol Culbertson, and Charles Swaney – under R.C. 303.24. In the complaint, Appellees alleged that they would be specially damaged by Enon's use of its property for surface mining and that Enon was required to obtain a conditional use permit from the Clark County Board of Zoning Appeals ("BZA") before engaging in surface mining.

{¶ 34} In December 2018, Enon filed a motion to dismiss and, alternatively, a motion for summary judgment, based on the fact that it had a prior lawful non-conforming use to surface mine on the property, that it was not required to obtain a conditional use permit, and that the claims against it were barred by res judicata based on the settlement agreement, which had provided that Enon had a prior lawful non-conforming use on the Demmy and Keifer parcels. The case was subsequently assigned to a visiting judge, who converted the motion into a motion for summary judgment based on the parties' agreement, and overruled the motion on November 24, 2019.

{¶ 35} Enon filed an answer to the complaint in January 2020, and then on March 6, 2020, it filed a motion in limine regarding the standing issue and Appellees' alleged special damages for the purposes of standing under R.C. 303.24. Enon also attached the Findings and Conclusions of the Reclamation Commission to the motion. Additionally, on March 9, 2020, Enon filed the deposition of Daniel Demmy, who had been

deposed during the federal court proceedings but had died before the current litigation began. Appellees filed a motion in limine the same day, seeking to exclude Demmy's testimony. On March 11, 2020, the court overruled Appellees' motion and said it would allow Enon to present evidence as to admissibility of the deposition. Enon then designated the deposition for use at trial.

{¶ 36} After holding a bench trial in late July 2020, the court filed a decision on August 7, 2020, excluding Demmy's testimony. The court then issued a decision on December 8, 2020, enjoining Enon from engaging in surface mining on the property without obtaining a conditional use permit. This timely appeal followed.

## II. Standing

{¶ 37} As noted, Enon has raised six assignments of error, one of which addresses standing. Since standing involves Appellees' right to bring the action and is a threshold issue, we will begin with that matter. Enon's third assignment of error, stated in a question format, is:

Whether the Trial Court Erred in Finding that Plaintiffs-Appellees Had

Standing under R.C. 303.24?

{¶ 38} Under this assignment of error, Enon argues first that Appellees lack standing because their evidence was legally insufficient to confer standing under R.C. 303.24. Enon further contends that Appellees' claimed special damages do not arise from the alleged violation (failure to obtain a conditional use permit), because the same damages would arise from surface mining with or without a conditional use permit. In addition, Enon maintains that a conditional use permit would not address Appellees'

alleged special damages because the County's zoning powers are limited and do not extend to matters of "general welfare." Another argument that Enon raises is that matters already regulated by other agencies cannot provide support for standing under R.C. 303.24. And finally, Enon contends that the balance of Appellees' concerns are not unique to them, but are shared by the public at large. Before addressing these points, we will briefly discuss the applicable standards of review.

## A. Standards of Review

{¶ 39} When appellate courts review trial court judgments following bench trials, a presumption applies that the trial court's findings are correct. *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, 29 N.E.3d 313, ¶ 21 (2d Dist.), citing *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 81 (10th Dist.). As a result, appellate courts may not substitute their judgment for that of trial courts and must affirm judgments that are "supported by some competent, credible evidence going to the essential elements of the case." *Gold* at ¶ 81, citing *Reilley v. Richards*, 69 Ohio St.3d 352, 632 N.E.2d 507 (1994), and *Koch v. Ohio Dept. of Nat. Resources*, 95 Ohio App.3d 193, 642 N.E.2d 27 (10th Dist.1994). "An appellate court must determine de novo, however, whether the trial court's conclusions of law, based on those findings of fact, were correct." *In re Cline*, 2d Dist. Montgomery No. 19082, 2002 WL 1393600, *2 (June 28, 2002). *See also Illum. Co. v. Bosemann*, 2020-Ohio-3663, 154 N.E.3d 1205, ¶ 32 (8th Dist.).

{¶ 40} Furthermore, appellate courts are "mindful that in a bench trial, 'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered

testimony.' " *Emswiler v. Bodey*, 2d Dist. Champaign No. 2012-CA-3, 2012-Ohio-5533, ¶ 44, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Consequently, where " 'the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " *Seasons Coal Co.* at 80, fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). *Accord Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21; *Emswiler* at ¶ 44.

## B. General Principles of Standing

**{¶ 41}** "Before an Ohio court can consider the merits of a legal claim, the person or entity seeking relief must establish standing to sue." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 27. " 'Standing' is defined at its most basic as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.' " *Id.*, quoting *Black's Law Dictionary* 1442 (8th Ed.2004). "Whether a party has established standing to bring an action before the court is a question of law, which we review de novo." *Moore v. Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, 975 N.E.2d 977, ¶ 20.

**{¶ 42}** "To succeed in establishing standing, plaintiffs must show that they suffered (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief." *Id.* at ¶ 22, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "It is well settled that standing does not depend on the merits of the plaintiff's contention that

particular conduct is illegal or unconstitutional. Rather, standing turns on the nature and source of the claim asserted by the plaintiffs." (Citation omitted.) *Id.* at ¶ 23. Consequently, we turn to the statute giving rise to standing in this case: R.C. 303.24.

## C. R.C. 303.24

**{¶ 43}** R.C. 303.24 states that:

In case any * * * land is or is proposed to be used in violation of sections 303.01 to 303.25, inclusive, of the Revised Code, or of any regulation or provision adopted by any board of county commissioners under such sections, such board, the prosecuting attorney of the county, the county zoning inspector, the county building inspector, or any adjacent or neighboring property owner who would be specially damaged by such violation, in addition to other remedies provided by law, may institute injunction, mandamus, abatement, or any other appropriate action or proceeding to prevent, enjoin, abate, or remove such unlawful location, erection, construction, reconstruction, enlargement, change, maintenance, or use.

**{¶ 44}** Thus, the statute requires property owners like Appellees to show that they would be specially damaged. In researching this point, we did not find any cases specifically interpreting this language in R.C. 304.24. However, both R.C. 519.24 (relating to regulations of township boards of trustees) and R.C. 713.13 (relating to municipal zoning ordinances) contain the same or similar limiting language.

**{¶ 45}** "While authorities are in disagreement as to what constitutes a special

injury, the majority view regards the special injury as an injury suffered by the plaintiff which is different in kind rather than degree from that suffered by other members of the public exercising the same public right." *Miller v. W. Carrollton*, 91 Ohio App.3d 291, 295-96, 632 N.E.2d 582 (2d Dist.1993), citing Prosser, *Private Action for Public Nuisance*, 52 Va.L.Rev. 997, 999 (1966).

{¶ 46} In the context of these statutes, diminished property value has been held to establish the needed special damages. *Ameigh v. Baycliffs Corp.*, 127 Ohio App.3d 254, 261, 712 N.E.2d 784 (6th Dist.1998). However, in the case before us, the trial court concluded that "none of the property owners' opinion testimony regarding diminished value was specific enough, or based upon credible evidence to establish by itself special damage by way of diminished value." Decision Granting Injunction (Dec. 8, 2020), p. 7. And, while the court found the testimony of Appellees' appraiser "very credible," the court stated that it believed his testimony alone was insufficient to establish special damages "without an opinion of the loss of value of each property because of noise, traffic, and dust." *Id.* at p. 8. Therefore, a decrease in property value was not established.

{¶ 47} Special damages can also be shown by proof that "the character of the neighborhood would be affected in a different manner from other * * * properties by the proposed use." *Ameigh* at 254. Pertinent to this point, the trial court concluded that property owners whose property bordered on Fairfield Pike, where 100 trucks would travel per day, would "be damaged in a manner not experienced by the general community who did not live on that road." Decision at p. 8. The court also took "judicial notice" that adjoining property values would be diminished if blasting occurred. *Id.* Finally, the court particularly relied on the testimony of Appellees' expert, Brett Huntsman, "who testified

that in his opinion all of [Appellees'] wells will be adversely affected by surface mining." *Id.*

**{¶ 48}** However, with respect to Huntsman's testimony, the trial court was legally precluded from considering it for standing purposes, based on collateral estoppel, or the issue preclusion aspect of res judicata. In Ohio, "[t]he doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *O'Nesti v. DeBartolo Realty Corp.*, 113 Ohio St.3d 59, 2007-Ohio-1102, 862 N.E.2d 803, ¶ 6, citing *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381, 653 N.E.2d 226 (1995). "Issue preclusion * * * serves to prevent relitigation of any fact or point that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies. * * * Issue preclusion applies even if the causes of action differ." (Citation omitted). *Id.* at ¶ 7.

**{¶ 49}** "As a general rule, in order for the principle of res judicata to be applicable, the parties to the subsequent action must be identical to those of the former action or be in privity with them." *Johnson's Island, Inc. v. Bd. of Twp. Trustees of Danbury Twp.*, 69 Ohio St.2d 241, 244, 431 N.E.2d 672 (1982).

**{¶ 50}** The Supreme Court of Ohio has said that "privity in the context of res judicata is somewhat amorphous." *Brown v. Dayton*, 89 Ohio St.3d 245, 248, 730 N.E.2d 958 (2000). "A contractual or beneficiary relationship is not required," and a broader definition is warranted in certain situations. *Id.* " 'As a general matter, privity "is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." ' " *Id.*, quoting

*Thompson v. Wing*, 70 Ohio St.3d 176, 184, 637 N.E.2d 917 (1990).

{¶ 51} "Res judicata, whether claim preclusion or issue preclusion, applies to quasi-judicial administrative proceedings." *State ex rel. Schachter v. Ohio Pub. Emps. Retirement Bd.*, 121 Ohio St.3d 526, 2009-Ohio-1704, 905 N.E.2d 1210, ¶ 29. The doctrine applies "where an administrative proceeding is of a judicial nature and where the parties have had an adequate opportunity to litigate the issues involved in the proceeding." *Superior's Brand Meats, Inc. v. Lindley*, 62 Ohio St.2d 133, 135, 403 N.E.2d 996 (1980).

{¶ 52} Collateral estoppel of decisions in administrative proceedings can also apply to later court actions between the same parties or persons in privity with parties to the administrative proceedings, unless there has "been a change in the facts in a given action which either raises a new material issue, or which would have been relevant to the resolution of a material issue involved in the earlier action." *State ex rel. Westchester Estates, Inc. v. Bacon*, 61 Ohio St.2d 42, 45, 399 N.E.2d 81 (1980).

{¶ 53} As an example of the application of res judicata, in *Green v. City of Akron*, 9th Dist. Summit No. 18284, 1997 WL 625484 (Oct. 1, 1997), the court barred further litigation of the issue of whether a city's civil service test and resulting promotional test were invalid, where the plaintiffs had previously litigated the issue in an administrative proceeding, but had failed to further appeal from that decision. *Id.* at *1. The court stressed that "the policy underlying *res judicata* justifies foreclosure of judicial review because 'bypassing the administrative avenue would deny the system important opportunities to make a factual record, apply its expertise, and correct its errors, in addition to inducing frequent and deliberate flouting of the administrative process.' " *Id.*

at *2, quoting *Beckham v. Gustinski,* 9th Dist. Summit No. 17621, 1996 WL 502318 (Sept. 4, 1996).

{¶ 54} In this regard, the *Green* court stated that:

In the case at bar, appellees properly pursued their administrative remedy by initially seeking review of the promotional examination at a hearing before the CSC [Civil Service Commission]. Once the CSC rendered a decision unfavorable to them, they had the opportunity to appeal it under R.C. 2506.01. This they chose not to do. Instead, they essentially sought collateral review of the CSC's decision by filing an original action in the lower court. Such sidestepping, or "deliberate flouting" of an administrative decision was exactly what this court sought to avoid in *Beckham, supra.* As this court has previously determined, "once a party elects to use administrative remedies and does not properly appeal from rulings which are adverse to that party, it is thereafter bound by such rulings under the doctrine of res judicata." *Warner Cable Comm., Inc. v. Neusser* (Oct. 6, 1993), Summit App. No. 16106, unreported.

*Green* at *2. *See also Scott v. City of E. Cleveland*, 16 Ohio App.3d 429, 431, 476 N.E.2d 710 (8th Dist.1984) ("doctrines of res judicata and collateral estoppel apply to quasi-judicial decisions made by administrative agencies from which no appeal has been taken"); *Chrysler Corp. v. Ohio Motor Vehicle Dealers Bd.*, 10th Dist. Franklin No. 00AP-476, 2001 WL 300641, *6 (Mar. 29, 2001); *Doan v. S. Ohio Adm. Dist. Council*, 145 Ohio

App.3d 482, 486, 763 N.E.2d 639 (10th Dist.2001).[5]

{¶ 55} "Determinations made in administrative proceedings are given preclusive effect (1) only if the parties had a full and fair opportunity to litigate the matters involved and (2) if the proceedings culminated in a definitive resolution of the matters." *Gerstenberger v. City of Macedonia*, 97 Ohio App.3d 167, 172-173, 646 N.E.2d 489 (9th Dist.1994), citing *Yashon v. Hunt*, 825 F.2d 1016, 1021 (6th Cir.1987). Agency proceedings "are considered quasi-judicial if there is notice, a hearing, and an opportunity for introduction of evidence." *Lindley*, 62 Ohio St.2d at 136, 403 N.E.2d 996, citing *State ex rel. Republic Steel Corp. v. Ohio Civ. Rights Comm.*, 44 Ohio St.2d 178, 184, 339 N.E.2d 658 (1975).

{¶ 56} Here, some Appellees exercised a right to appeal the decision of the Chief of DMRM and fully participated in an administrative hearing, during which they were able to present evidence, including that of their own hydrogeologic expert, Huntsman, and to cross-examine witnesses of both the DMRM and Enon. Under the above standards, the requirements for giving res judicata effect to an administrative proceedings were satisfied. Additionally, Appellees were clearly in privity with the parties who appealed to the Reclamation Commission, as they all have identical interests, which is to prevent Enon from being able to engage in surface mining at the proposed site.

{¶ 57} During the state court trial, the court appears to have disbelieved that anything occurring at the permitting level could impact its decision on standing because

---

[5] An exception exists for administrative decisions on unemployment compensation, which are statutorily exempted under R.C. 4121.28(D)(8) from having collateral estoppel or res judicata effect in later judicial proceedings. *E.g., Hatton v. Interim Health Care of Columbus, Inc.*, 10th Dist. Franklin No. 06AP-828, 2007-Ohio-1418, ¶ 29.

the administrative level concerned "permitting," while the court was considering "zoning." Tr. at p. 243-246. However, the court was incorrect in automatically discarding any potential impact without considering whether the issues could be the same.

{¶ 58} Collateral estoppel involves points of law or fact that were "actually and directly in issue in the former action * * *." *Scholler v. Scholler*, 10 Ohio St.3d 98, 105, 462 N.E.2d 158 (1984). When we speak of issues, however, we do not mean the cause of action; we mean the issue of whether Enon's facility would impact Appellees' wells. This issue pertains both to whether a DMRM permit should be issued and to whether Appellees would be specially damaged if Enon engages in surface mining without obtaining a conditional use permit.

{¶ 59} During the court trial, Huntsman testified that he had already offered the opinions he currently was advancing at the hearing before the Reclamation Commission of Ohio on behalf of an appeal brought by Swaney, Verbillion, and a citizens' group called Citizens Against Mining Mad River Township. Tr. at p. 136. It is clear that Swaney and Verbillion were directly involved in the administrative proceeding, had an opportunity to fully litigate, and are in privity, i.e., share identical interests with the Appellees who were not part of that proceeding.

{¶ 60} Huntsman further stated that he had testified at some length during the administrative proceeding, and that he had previously testified to the same opinions about the impact that he believed was going to happen to Appellees' water wells, i.e., that there would be no way to remediate the wells because no water would be available. *Id.* at p. 137 and 139.

{¶ 61} In its decision, the Commission discussed the water issue extensively. In fact, this discussion encompassed 18 of the 32 pages of the decision. The discussion itself included potential dewatering, the cone of depression, Enon's ground water model (which took two years to conceptualize and develop), the impact of the dewatering on the hydrologic area, which encompassed a four-mile radius from the proposed permit area's boundaries, plans for water replacement for potentially impacted areas, and information that "aquifers will not be totally dewatered by mining. In all cases, Enon anticipates that ground water will be available to local users in adequate quantities." *Id.* at p. 24.

{¶ 62} In addition, the Commission specifically rejected CAM's contention that "based on the cone of depression projections, no water will be available if wells are deepened." *Id.* Concerning this contention, the Commission stated that:

> To the extent that cone of depression projections indicate that water will fall <u>below</u> the level of mining, that is impossible. The cone of depression rises higher in the geologic strata the further it is from the mine. Therefore, there should be <u>some</u> water available to which a well could be deepened. In addition, a well could be drilled below the water productizing zone for the express purpose of creating storage space within the well bore. Testimony was also presented that a well could be configured so that, if it was not producing significant amounts of water, it could be sporadically pumped into a storage tank to ensure that sufficient stored water is available to the user. CAM has not established that it would be impossible to supply replacement water by the methods put forth by Enon.

(Emphasis sic.) Ex. C at p. 24.

{¶ 63} In view of these facts, the trial court erred in failing to even consider whether the issues in the administrative proceeding and the civil case were the same concerning the impact on Appellees' water – which was one basis for granting standing to Appellees.[6]

{¶ 64} As indicated, after having taken judicial notice of blasting, the trial court also found that Appellees would incur "special damages" in this regard. Enon argues that the court could not take judicial notice of this fact. Appellant's Brief, p. 23, fn. 18.

{¶ 65} Under Evid.R. 201(C), "[a] court may take judicial notice, whether requested or not." Evid.R. 201(B) further provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And finally, a court may also take judicial notice "at any stage of the proceeding." Evid.R. 201(F).

{¶ 66} During trial, the court commented that it ought to be able to take judicial notice of the fact that an explosion next door to its property would be "irritating," but that it was not certain. Tr. at p. 593. In view of the requirements of Evid.R. 201, this is not a proper subject for judicial notice. The court did not point to any evidence that this "fact" was generally known in the court's territorial jurisdiction or that the point could be accurately and readily determined by resort to unquestionable sources. This may have

---

[6] Enon's counsel did not assist the trial court when he indicated that he was not asserting collateral estoppel in this context. Tr. at p. 245-256. Ordinarily, we would consider the argument waived. However, counsel did indicate, although inarticulately, that Enon contended that the water issue, as well as blasting and other matters, were not proper for purposes of establishing standing because they were regulated by state agencies. *Id.* at p. 245. Enon also submitted the Reclamation Commission Decision to the trial court, which admitted it, and questioned Huntsman and Swaney at some length about the administrative proceeding. *Id.* at p. 136-147 and 235-241.

been the court's personal opinion, but that is not a basis for taking judicial notice.

{¶ 67} As support for taking judicial notice of diminished property value due to blasting, the court did mention the testimony of two witnesses, Jeff Harvey and James Matthews. Decision Granting Injunction (Dec 8, 2020), at p. 8. However, the transcript does not reveal that Harvey mentioned blasting or diminution of property values due to blasting. Tr. at p. 317-334. Instead, he commented only that the property owners might, because of proximity, be affected more than other parts of the population due to traffic noise, disruption to wildlife patterns, dust, congestion, and truck traffic. *Id.* at p. 326. Harvey further stated that, among other things, he did not review any noise studies. *Id.* at p. 331.

{¶ 68} The other witness, Matthews, had worked with Daniel Demmy in surface mining from 1974 or 1975 through 1982 and then again from October 2000 to December 2014. Tr. at p. 456. Matthews indicated that one of the jobs he did for Demmy was to arrange for blasting in Keifer I, "[w]henever the blasting was done a couple of times." *Id.* at p. 467. Matthews stated that he received "some complaints as far as blasting" because of the noise. *Id.* at p. 468. However, he also said that "Some people talked about the noise, but they had other things that made the same noise." *Id.* Matthew further stated, "I wouldn't say [a group of people'] were complaining, but they did say there was a lot of noise that would come and be gone in seconds. * * * Most of the people probably weren't at home during blasting. They were probably at work." *Id.* at 469.

{¶ 69} This testimony was vague, and neither witness testified about diminution of property values due to blasting. As a result, the court erred in relying on this testimony to reach its conclusion about judicial notice and the fact that property values would

diminish due to blasting.

{¶ 70} Any error by the court on the above points was harmless, however, because the court also found special damages to property owners abutting Fairfield Road, due to the amount of traffic generated by 100 trucks a day entering Fairfield Road. This is a somewhat slender reed upon which to rest standing, but the fact is that Enon's president, Garrison, did anticipate that 100 trucks carrying a total of 2,000 tons a day during construction season would not be unreasonable. *Id.* at p. 533. This is not a matter to which the general public would be exposed and established that Appellees would suffer special damages different from the general public. *Compare Ameigh*, 127 Ohio App.3d at 261-262, 712 N.E.2d 784 (property owners' affidavits raised factual issues regarding special damages where they alleged great increase in traffic noise, congestion, and sewage, and negative effect on scenic value).

{¶ 71} Enon argues that Appellees' special damages would occur regardless of whether Enon obtains a conditional use permit, and that their damages would not be addressed by requiring Enon to obtain such a permit, because counties have limited ability to regulate surface mining and cannot consider general welfare. In support of these facts, Enon cites R.C. 303.02(A), R.C. 303.14(C), R.C. 303.141(A), and cases interpreting these and similar statutes.

{¶ 72} It is true that the General Assembly has limited the power of county zoning boards to regulate surface mining. R.C. 303.02(A) allows boards to regulate the use of land for trade and industry "in the interest of the public convenience, comfort, prosperity, or general welfare,* * * in accordance with a comprehensive plan." However, a board may "regulate * * * only in the interest of public health and safety" "[f]or any activities

permitted and regulated under Chapter 1513. or 1514. of the Revised Code and any related processing activities * * *."  *Id.*

{¶ 73} R.C. 303.14(C) further states that while a board may grant conditional zoning certificates, "[i]f the board considers conditional zoning certificates for activities that are permitted and regulated under Chapter 1514. of the Revised Code or activities that are related to making finished aggregate products, the board shall proceed in accordance with section 303.141. of the Revised Code."   In its brief, Enon recites only the first part of R.C. 303.141(A), which focuses on a requirement that the county board not consider or base its decision on matters regulated by federal state or local agencies. Appellant's Brief at p. 22.   However, the full text of R.C. 303.141(A) states that:

> If a county board of zoning appeals considers conditional zoning certificates for activities that are permitted and regulated under Chapter 1514. of the Revised Code or activities that are related to making finished aggregate products, the board shall not consider or base its determination on matters that are regulated by any federal, state, or local agency. However, the board may require as a condition of the approval of a conditional zoning certificate for such an activity compliance with any general standards contained in the zoning resolution that apply to all conditional uses that are provided for in the zoning resolution and, except as provided in division (C) of this section, may require any specified measure, including, but not limited to, one or more of the following:
>
> (1) Inspections of nearby structures and water wells to determine structural integrity and water levels;

(2) Compliance with applicable federal, state, and local laws and regulations;

(3) Identification of specific roads in accordance with division (B) of this section to be used as the primary means of ingress to and egress from the proposed activity;

(4) Compliance with reasonable noise abatement measures;

(5) Compliance with reasonable dust abatement measures;

(6) Establishment of setbacks, berms, and buffers for the proposed activity;

(7) Establishment of a complaint procedure;

(8) Any other measure reasonably related to public health and safety.

{¶ 74} R.C. 519.02(A), R.C. 519.14(C), and R.C. 514.141(A) contain the same restrictions on the ability of township trustees in the context of surface mining. In a recent decision (cited by Enon), the Supreme Court of Ohio considered a township's zoning resolution for conditional use permits under these statutes. *See Columbus Bituminous Concrete Corp. v. Harrison Twp. Bd. of Zoning Appeals*, 160 Ohio St.3d 279, 2020-Ohio-845, 156 N.E.3d 841. The resolution included quarrying and mining operations within the permitted conditional uses in a business district " 'if all County, State and federal regulations are met and licenses are obtained.' " *Id*. at ¶ 10. In addition, the resolution contained various general conditions for conditional uses, such as that the use would be harmonious with the existing area and not change it; that the use would not be " 'detrimental to any persons, property, or the general welfare by reason of excessive production of traffic, noise, smoke, fumes, glare or odors,' " and that the use would " 'be

consistent with the objectives' " of the zoning resolution and any comprehensive plan that had been adopted for the area. *Id.* at ¶ 12.

{¶ 75} After the applicant (CCBC) submitted an application for a conditional use permit to engage in surface mining of sand and gravel, the BZA denied it without discussion, merely finding that CCBC was "unable to affirmatively prove all the requirements" of the general conditions. *Id.* at ¶ 15. The trial court agreed, and identified evidence supporting the failure to meet the conditions. *Id.* at ¶ 16. After the court of appeals also agreed, the Supreme Court of Ohio allowed review. *Id.* at ¶ 17-18.

{¶ 76} Based on the content of the statutes in question, the Supreme Court of Ohio agreed with CCBC that "a general standard that does not relate to public health or safety cannot be applied to deny a conditional-use application to engage in mining activities." *Id.* at ¶ 21 and 24. The court therefore held that the township could "require compliance with the General Standards only insofar as doing so is in the interest of public health and safety," and that even when compliance with the General Standards is in the interest of public health and safety, the BZA may require compliance with those standards only as conditions of the approval of an application. The BZA may not deny an application to engage in mining when it finds the applicant has not established compliance with those standards." *Id.* at ¶ 28.

{¶ 77} Notably, the court did not reject the zoning resolution's general conditions because they were not matters of public safety or health; instead, the court remanded the case to the BZA for consideration of the evidence. *Id.* at ¶ 30. The court also allowed the BZA to apply the conditions only to the extent they involved public health and safety and to impose conditions on the application consistent with these matters. *Id.*

{¶ 78} The statutes in question here do not specifically define public health and safety, but the Supreme Court of Ohio has said that a zoning resolution promotes public health and safety where the provisions "regulate potential hazards." *Apple Group, Ltd. v. Granger Twp. Bd. of Zoning Appeals*, 144 Ohio St.3d 188, 2015-Ohio-2343, 41 N.E.3d 1185, ¶ 23. Congestion and dust caused by a substantial amount of truck traffic could certainly pose risks to health and safety and would be a proper subject of zoning.

{¶ 79} Nonetheless, we think Enon's argument misses the point. In allowing property owners to bring actions under R.C. 303.24, special damages to the owner (as opposed to the general public) are required. This has nothing to do with whether a zoning resolution itself, and the restrictions it may place on conditional uses, properly relate to public safety or health. Whether the zoning conditions, if any, that the BZA might ultimately impose are appropriate is irrelevant to the issue of whether Appellees have established damages that are special to them as opposed to damages the public in general might suffer. There is no guarantee that a conditional use permit will ever be issued, and if so, what conditions might be imposed. By the same token, it is irrelevant whether damage would occur regardless of whether a conditional use permit is issued.

{¶ 80} Enon further argues that matters already regulated by other federal and state agencies cannot be used to confer standing under R.C. 303.24. The statutes that Enon cites refer to water quality and contamination, blasting, dust and sound levels. In this context, Enon also notes that all ODNR decisions are subject to appeal to the Reclamation Commission. We have already considered this latter point in the context of collateral estoppel and standing.

{¶ 81} Regarding the remaining statutes that Enon cites, we disagree that the

county board lacks the ability to regulate anything pertaining to these subjects. The Board, even in matters of surface mining, is specifically allowed to regulate in the interest of public health and safety. R.C. 303.02(A); R.C. 303.14(C); and R.C. 303.141(A). There is no logical reason to conclude that the General Assembly included this ability within the power granted to county boards simply as a meaningless gesture. Moreover, as noted, whether Appellees have established special damages is a separate issue from the requirements of a conditional use permit.

{¶ 82} Enon's final argument is that increased traffic is not a concern unique to Appellees but is shared by the public at large. As support, Enon cites *Conkle v. S. Ohio Med. Ctr.*, 4th Dist. Scioto No. 04CA2973, 2005-Ohio-3965, in which the court said that "[g]enerally, 'concerns regarding increased traffic * * * are concerns shared equally by the public at large and, therefore, are not adequate grounds upon which to confer standing.' " *Id.* at ¶ 14, quoting *Jenkins v. Gallipolis*, 128 Ohio App.3d 376, 381-382, 715 N.E.2d 196 (4th Dist.1998), which in turn cites *Westgate Shopping Village v. City of Toledo*, 93 Ohio App.3d 507, 639 N.E.2d 126 (6th Dist.1994).

{¶ 83} The original comment about "increased traffic" was made in *Westgate*, in the context of whether Westgate, a shopping center located two miles away from another shopping mall, had standing under R.C. 2506.01 to appeal from passage of an ordinance allowing the other shopping mall to increase its leasable space. *Id.* at 509-510. The idea of increased traffic was one of the points Westgate raised when attempting to appeal, and the court noted that idea of increased traffic in the shopping mall's vicinity was a concern faced by the general public. *Id.* at 513-514. However, the properties were two miles apart, not adjacent, as is the situation here.

{¶ 84} The standing inquiry in *Westgate* was over whether "the appellant's property rights were directly affected by the administrative order appealed." *Id*. at 513. The court did find standing because Westgate could suffer a decrease in its property values due to the ordinance. *Id*. at p. 514.

{¶ 85} In *Jenkins,* another R.C. Ch. 2506 appeal, a party seeking to appeal a decision allowing the building of a Wal-Mart, was, in fact, held to have standing, because he claimed that "his property value would decrease due to an increase in traffic." *Jenkins* at 383. And finally, while *Conkle* involved R.C. 713.13 (the municipal equivalent of R.C. 303.24), the party claiming standing "did not even directly aver that traffic increased on Sherman Road as a result of a hospital's action in improving an easement located on its own property." *Conkle* at ¶ 17.

{¶ 86} As indicated, these cases involved different situations than the one presented here. To the extent they have any similarity, they support standing here. After all, the word "generally" means just that – not "always." The amount of traffic and congestion involved in the case before us is also more than just an increase in traffic to the general public. Accordingly, despite having committed some error, the trial court's error was harmless and did not impact the fact that Appellees had standing to bring the case. Enon's third assignment of error, therefore, is overruled.

### III. Res Judicata Relating to the Effect of the Federal Litigation

{¶ 87} Enon's first assignment of error, again phrased as a question, is:

Whether the Trial Court Erred in Finding That Plaintiffs-Appellees Were Not Barred From Bringing This Action by the Doctrine of Res Judicata

by Virtue of a Prior Judgment Entered by the United States District Court for the Southern District of Ohio?

{¶ 88} Under this assignment of error, Enon contends that the trial court erred in refusing to bar Appellees' claims based on the application of res judicata. Specifically, under the settlement agreement and the stipulated judgment entry filed in the prior federal court action, Enon, the Board, and Thomas Hale, the Zoning Administrator, agreed, with respect to the Demmy and Keifer parcels, "that surface mining constitutes and remains a prior, legal non-conforming use ('the Non-Conforming Use') of the Demmy and Keifer Parcels protected and permitted to continue under Ohio law notwithstanding the CCZR." Ex. SSS at p. 3. They further agreed that "the Non-conforming Use of the Demmy and Keifer Parcels extends to and encompasses any and all aspect of surface mining as defined in, and permitted by, R.C. Chap. 1514 (as the same may be amended from time to time) including without limitation (i) all surface mining activities permitted by the Ohio Department of Natural Resources under Surface Mine Permit IM-340 or any other surface mining permit applicable to the Demmy and Keifer parcels; and, (ii) the Surface Mining Uses." *Id.*

{¶ 89} Under the agreement, "Surface Mining Uses" collectively refers to "surface mining," to holding property in reserve for further surface mining, and to using the Demmy and Kiefer parcels for incidental purposes necessary to surface mining. *Id.* at p. 1-2.

{¶ 90} In the trial court, Enon moved for summary judgment on res judicata grounds, but the court found material issues of fact concerning whether Appellees were in privity with the Board and whether the issues were directly or actually litigated in the federal suit. Decision Overruling Motion for Summary Judgment (Oct. 24, 2019), p. 5.

After hearing the evidence at trial, the court said that no new evidence had been presented on the issue. Consequently, the court again concluded that privity was lacking and that issue preclusion, or collateral estoppel, would not apply for the reasons the court had previously given. Decision Granting Injunction (Dec. 8, 2020), at p. 5.

{¶ 91} " ' "The issue of whether res judicata * * * applies in a particular situation is a question of law that is reviewed under a de novo standard." * * * A de novo standard of review affords no deference to the trial court's decision, and we independently review the record to determine whether res judicata applies.' " *Buckeye Retirement Co., L.L.C. v. Busch*, 2d Dist. Greene No. 2010-CA-51, 2011-Ohio-1125, ¶ 19, quoting *Hempstead v. Cleveland Bd. of Edn.*, 8th Dist. Cuyahoga No. 90955, 2008-Ohio-5350, ¶ 6.

{¶ 92} In challenging the trial court's decision, Enon first argues that the court erred in relying on collateral estoppel, which preludes relitigation of issues that were directly litigated in a prior proceeding. Enon contends that it instead argued the claim preclusion aspect of res judicata, which bars relitigation of all claims that " 'were or *might have been* litigated in the first lawsuit.' " (Emphasis sic.) Appellant's brief at p. 13, quoting *Natl. Amusements, Inc. v. City of Springdale*, 53 Ohio St.3d 60, 62, 558 N.E.2d 1178 (1990).

{¶ 93} In a post-trial memorandum, Enon did raise the trial court's prior conflation of the two aspects of res judicata and stressed that the final judgment in the federal action barred any claims that were brought or might have been brought in the federal action. Defendant's Closing Brief (Sept. 16, 2020), p. 26-27. However, the trial court ignored this argument. We agree with Enon that the trial court erred in this regard. Because the matter was resolved through settlement, there is no way in which the issue of whether a prior legal non-conforming use existed could have been directly or actually litigated.

Instead, the pertinent question was whether the federal court action barred the state court case under the claim preclusion aspect of res judicata.

{¶ 94} There is no requirement that a matter be actually litigated in order for the claim preclusion aspect of res judicata to apply, and a settlement of the case, as occurred here, was sufficient. *In re Gilbraith*, 32 Ohio St.3d 127, 129, 512 N.E.2d 956 (1987), citing *Horne v. Woolever*, 170 Ohio St. 178, 182, 163 N.E.2d 378 (1959) ("as a general rule, a consent judgment operates as *res judicata* with the same force given to a judgment entered on the merits in a fully adversarial proceeding").

{¶ 95} Accordingly, the trial court erred in only considering issue preclusion. However, if no privity existed, the error was harmless. Thus, the dispositive issue is whether privity existed between Appellees and the Board.

{¶ 96} As noted, res judicata does not apply unless the parties in the later action (here, Appellees) are identical to the parties in the former action or are in privity with them. *Johnson's Island*, 69 Ohio St.2d at 244, 431 N.E.2d 672. A "mutuality of interest, including an identity of desired result," can create privity. *Brown*, 89 Ohio St.3d at 248, 730 N.E.2d 958.

{¶ 97} From a certain perspective, the Board and Appellees (as well as other parties like county prosecutors and zoning inspectors who are named in R.C. 303.24) have a mutual interest in redressing zoning violations, and may even desire identical results. However, that is not necessarily true. For example, in *Loichot v. Allstate Dev. Corp.*, 33 Ohio App.2d 121, 292 N.E.2d 923 (5th Dist.1963), a landowner sued under R.C. 519.24 (the township enforcement statute) to prevent a corporation from erecting certain buildings and also sued the township zoning inspector to prevent him from issuing

a zoning certificate. *Id.* at 122. In that case, the landowner and township representative obviously did not desire the same result, since the zoning inspector had already issued the certificate.

**{¶ 98}** In the case before us, there is no indication that the Board and Appellees had a mutual interest. In federal court, the Board was a defendant and may have simply wished to end litigation at the least expense. The Board also stood by, silently, when Enon opposed Swaney's intervention in the federal court action. Furthermore, the settlement agreement itself contemplated further action by other parties, by stating in Section 5 that:

> **Effect of Citizen or Other Action**. The Parties agree that, if the Settlement Agreement cannot be implemented or enforced due to some form of citizen action or some form of action taken by the County, the Settlement Agreement shall be deemed null and void and Plaintiff shall be entitled to have its claims revived and the dismissal of the litigation vacated * * *."

Ex. SSS at p. 5.

**{¶ 99}** To this point, on the very day the Board approved the settlement agreement, Appellees initiated their citizen action in the common pleas court. Accordingly, there was no privity in this situation between Appellees and the Board, and the trial court reached the correct result in refusing to apply res judicata, although it did so for the wrong reasons. In these situations, we are still able to affirm the trial court. *BND Rentals, Inc. v. Dayton Power & Light Co.,* 2020-Ohio-4484, 158 N.E.3d 993, ¶ 64 (2d Dist.) (noting the established principle that appellate courts may affirm based on reasoning that differs from

that of the trial court).

{¶ 100} The first assignment of error, therefore, is overruled.

IV. Collateral Attack

{¶ 101} Enon's second assignment of error, stated in question form, is:

Whether the Trial Court Erred in Finding Plaintiffs-Appellees' action in the Trial Court Was Not an Impermissible Collateral Attack on the Federal Court Judgment?

{¶ 102} Under this assignment of error, Enon contends that Appellees' action is impermissible under the "collateral attack" doctrine, which, unlike res judicata, applies both to parties and non-parties. In support of its position, Enon relies heavily on *Ohio Pyro,* 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550. In that case, Safety 4th had previously sued the Ohio Fire Marshal in 1999 in Jefferson County, Ohio, seeking to relocate its licenses to sell fireworks. *Id.* at ¶ 2. Several competitors, including Ohio Pyro, tried to intervene in the action, but were unsuccessful. *Id.* at ¶ 5. The action was then settled in 2001 with an agreement that Safety 4th would be able to relocate its licenses upon compliance with certain conditions. *Id.* at ¶ 6-7.

{¶ 103} After Safety 4th purchased a site in Fayette County and took steps to comply with the conditions, Ohio Pyro filed a lawsuit in Fayette County in 2004, seeking a declaratory judgment and an injunction preventing the Fire Marshal from issuing a permit to Safety 4th. The suit alleged that the Fire Marshal had agreed in the prior action to perform acts that were outside his authority. *Id.* at ¶ 9-10. In May 2004, the Fayette County court granted a preliminary injunction preventing the Fire Marshal from issuing a

license to Safety 4th anywhere other than where Safety 4th was currently licensed, pending further proceedings. *Id.* at ¶ 11.

**{¶ 104}** However, the Jefferson County court then ordered the Fire Marshal to grant Safety 4th a license in Fayette County. *Id.* at ¶ 13, fn. 4   In turn, the Fayette County court granted summary judgment to Ohio Pyro and also granted a permanent injunction precluding the Fire Marshal from approving Safety 4th's relocation to Fayette County or to any other political subdivision other than where it was presently located. *Id.* at ¶ 13.   On appeal, the Fayette County judgment was affirmed.   The Supreme Court of Ohio then granted review to decide if the Fayette County judgment was an impermissible collateral attack on the original action in Jefferson County. *Id.* at ¶ 14-15.

**{¶ 105}** According to the court, a collateral attack is " ' "an attempt to defeat the operation of a judgment, in a proceeding where some new right derived from or through the judgment is involved." ' "   *Ohio Pyro*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, at ¶ 16, quoting *Fawn Lake Apts. v. Cuyahoga Cty. Bd. of Revision*, 85 Ohio St.3d 609, 611, 710 N.E.2d 681 (1999).   (Other citation omitted).   Although related to res judicata, collateral attack "functions independently," and "applies to both parties and nonparties." *Id.* at ¶ 15.   However, the doctrine is disfavored and, because it attacks a judgment's integrity, not its merits, "it applies only where "a judgment was issued without jurisdiction or was procured by fraud." *Id.* at ¶ 22 and 25.

**{¶ 106}** After considering the circumstances, the supreme court concluded that Ohio Pyro's action was an impermissible collateral attack on the merits of the prior judgment. *Id.* at ¶ 26.   In light of the similarity to the case before us (a settlement that was not procured by fraud in a court with jurisdiction and a subsequent attack by a non-

party), Enon argues that the case before us represents, like *Ohio Pyro*, an impermissible collateral attack on the prior judgment.

{¶ 107} We disagree, as an important distinction exists. After stating that Ohio Pyro's action was an impermissible collateral attack, the court stressed that, because there are limitations on the ability of a judgment to bind a non-party, "an analysis of this case would be incomplete without examining Ohio Pyro's standing to assert the claims of its complaint as the basis for a collateral attack on the 2001 Jefferson County judgment." *Id.* at ¶ 27. The court then found that the rights Ohio Pyro asserted in its complaint were insufficient to confer standing. *Id.* at ¶ 28-30.

{¶ 108} In contrast, we have found that Appellees have standing under R.C. 303.24 to bring the current action. Furthermore, as noted, the settlement in federal court specifically contemplated that a citizen action could be brought. Accordingly, the collateral attack doctrine does not apply, and the second assignment of error is overruled.

## V. Deposition of Daniel Demmy

{¶ 109} Enon's fourth assignment of error, again in question form, is:

Whether the Trial Court Erred in Excluding the Former Testimony of Deceased Witness Daniel Demmy?

{¶ 110} Daniel Demmy, his wife, and their associated entities sold the subject property to Enon in 2015. During the federal court litigation, Demmy was deposed and offered testimony about the prior non-conforming uses of the property. Unfortunately, Demmy died before Appellees filed suit in state court. The trial court rejected Enon's attempt to have Demmy's testimony introduced, reasoning that the deposition was a

discovery deposition in which Demmy's testimony as to non-conforming uses was not rigorously explored and was intended to support the settlement. Decision Excluding the "Former Testimony" of Daniel Demmy (August 7, 2020), p. 2. The court also noted its prior finding that the Board was not in privity with Appellees. *Id.* at p. 1-2.

**{¶ 111}** We review decisions admitting or excluding evidence for an abuse of discretion. *Estate of Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22. This requires a finding that the trial court acted unreasonably, arbitrarily, or unconscionably. *Id.* "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 59 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

**{¶ 112}** Under Evid.R. 804(A)(1)(4), a witness is considered unavailable if he or she "is unable to be present or to testify at the hearing because of death or then-existing physical or mental illness or infirmity." Where a witness is unavailable, Evid.R. 804(B)(1) states that the following is not excluded by the hearsay rule:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

**{¶ 113}** "This exception to the hearsay rule applies to former testimony offered

against a party when that party or the party's predecessor-in-interest was a party to the prior proceeding. The term 'predecessor-in-interest' is generally treated as interchangeable with the phrase 'persons in privity' and refers to one 'from whom the present party received the right, title, interest or obligation that is at issue in the current litigation.' " *Burkhart v. H.J. Heinz Co.*, 140 Ohio St.3d 429, 2014-Ohio-3766, 19 N.E.3d 877, ¶ 26, quoting Lilly, *An Introduction to the Law of Evidence*, Section 7.23, at 328. In *Burkhart*, the Supreme Court of Ohio rejected the federal interpretation "that a shared interest in the material facts and outcome of the case creates an interest sufficient to admit former testimony." *Id.* at ¶ 28. Instead, the court emphasized Ohio's traditional common law requirement that a predecessor-in-interest is interchangeable with privity, and the fact that the Evid.R. 804(B)(1) requirements are conjunctive. *Id.* at ¶ 26-27 and 30-31.

{¶ 114} While we might disagree with the conclusion that the examination of Demmy lacked rigor (which is not a requirement, anyway), we have previously concluded that Appellees were not in privity with the Board with respect to the prior federal action. That conclusion is fatal to Enon's attempt to admit Demmy's deposition. Consequently, since the trial court did not act unreasonably in excluding the deposition, Enon's fourth assignment of error is overruled.


VI. Enon's Alleged Prior Legal Non-conforming Use

{¶ 115} Enon has combined its discussion of the fifth and sixth assignments of error, and we will do the same. These assignments of error, phrased as questions, are:

Whether the Trial Court Erred in Finding That Defendant-Appellant

Had Not Proven a Prior, Legal Non-conforming Use to Engage in Surface Mining on the Property at Issue?

Whether the Trial Court Erred in Finding That Defendant-Appellant's Predecessors in Interest Had Abandoned the Prior, Legal Non-conforming Use to Engage in Surface Mining on Certain of the Property at Issue?

{¶ 116} Under these assignments of error, Enon asserts several challenges to the trial court's holding that it lacked a prior non-conforming use of the properties. We will address these points in order.

A.   Multiple parcels

{¶ 117} Enon's first point is that the trial court erred in failing to apply the principle that a prior legal non-conforming use extends to all the land, including multiple parcels, even when they are separated by roads.   The court agreed in theory with this general principle.   However, the court found that Enon's intent at the time of purchase (2015) was irrelevant.   The court also stressed the lack of evidence about the prior owners' intent when the property was originally purchased.   Decision Granting Injunction (Dec. 8, 2020), at p. 11.

{¶ 118} As we noted, in situations involving bench trials, appellate courts may not substitute their judgment for that of trial courts, and must affirm judgments that are "supported by some competent, credible evidence going to the essential elements of the case."   *Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, at ¶ 81. However, we do apply de novo review to "whether the trial court's conclusions of law, based on those findings of fact, were correct."   *Cline*, 2d Dist. Montgomery No. 19082,

2002 WL 1393600, at *2.

{¶ 119} "Non-conforming use" is a "term of art" that "is employed to designate a use of property which was lawful prior to the enactment of a zoning ordinance and which use may be continued after the effective date of the ordinance even though it does not comply with the applicable use restrictions." C.*D.S., Inc. v. Village of Gates Mills*, 26 Ohio St.3d 166, 168, 497 N.E.2d 295 (1986). The law is well-established that landowners have a right to use their property " 'in a lawful business and in a manner which does not constitute a nuisance and *which was lawful at the time* such business was established * * *.' " (Emphasis sic.) *Pschesang v. Village of Terrace Park*, 5 Ohio St.3d 47, 48, 448 N.E.2d 1164 (1983), quoting *Akron v. Chapman*, 160 Ohio St. 382, 116 N.E.2d 697 (1953), paragraph two of the syllabus.

{¶ 120} The party asserting a non-conforming use of property has the burden of proving such use. *Penewit v. Spring Valley Bd. of Zoning Appeals*, 2d Dist. Greene No. 2019-CA-6, 2019-Ohio-3200, ¶ 32. "In order to qualify as a prior nonconforming use, a land use must meet two requirements. Initially, the use must have been in existence prior to the enactment of the prohibitory land use regulation or the extension of the regulation to newly annexed territory." *Dublin v. Finkes*, 83 Ohio App.3d 687, 690, 615 N.E.2d 690 (10th Dist.1992). Second, "to qualify as a nonconforming use, the land use in question must have been 'lawful' when commenced." *Id.*, citing *Pschesang* at syllabus. "A change in the ownership or tenancy of a nonconforming business or structure generally does not affect the right to continue the nonconforming use because the right attaches to the land itself." *Beth Jacob Congregation v. City of Huber Hts. Bd. of Zoning Appeals,* 2d Dist. Montgomery No. 16650, 1998 WL 125568, *4 (March 20,

1998), citing Young, *American Law of Zoning*, Section 6.40 (1996). *Accord Herres v. Harrison Twp. Bd. of Trustees*, 2d Dist. Montgomery No. 23668, 2010-Ohio-3909, ¶ 17 ("once it is established, a legal nonconforming use passes to successive owners").

{¶ 121} Furthermore, " '[w]here a zoning resolution provides that an existing and nonconforming use may be continued but contains no provision as to a permit therefor, it is not necessary as a condition precedent to such continuance to secure from the zoning authorities such a permit.' " *City of Marietta v. Bd. of Trustees for Washington Cty. Woman's Home*, 2020-Ohio-5144, 161 N.E.3d 736, ¶ 70 (4th Dist.), quoting *State v. Pierce*, 164 Ohio St. 482, 132 N.E.2d 102 (1956), paragraph one of the syllabus. " 'In other words, where a use exists at the time a zoning resolution or ordinance takes effect, which makes such use nonconforming and does not provide for an application to continue such use, such use may be continued under the terms of the ordinance or resolution, and a permit to continue such nonconforming use is not required.' " *Id.*, quoting *Pierce* at 184.[7]

{¶ 122} "Where no substantial nonconforming use is made of property, even though such use is contemplated and money is expended in preliminary work to that end, a property owner acquires no vested right to such use and is deprived of none by the operation of a valid zoning ordinance denying the right to proceed with his intended use of the property." *Smith v. Juillerat*, 161 Ohio St. 424, 119 N.E.2d 611 (1954), paragraph

---

[7] The trial court appeared to believe that Enon should have applied for a permit or should have appealed the informal letter that was sent. Tr. at p. 540 and 545-549. However, the 1964 CCZR does not contain a permit requirement, and Enon, to the extent that it believed it had an existing non-conforming use, did not need to apply for a permit. There was also no need to appeal from the informal letter; the Clark County employees clearly stated that the letter was simply informative and there was no appeal process for that. Tr. at p. 397 and 456.

four of the syllabus.

{¶ 123} "In the event that the legality of a use, at the time the use was established, cannot be determined, the earliest applicable zoning, in evidence, subsequent to the establishment of the use, shall control."   *Petti v. City of Richmond Hts.*, 5 Ohio St.3d 129, 449 N.E.2d 768 (1983), syllabus.

{¶ 124} The trial court was correct in agreeing that a prior legal non-conforming use developed on part of a property may extend to the other parts or parcels.   *E.g., City of Columbus v. Union Cemetery Assn.*, 45 Ohio St.2d 47, 341 N.E.2d 298 (1976).   In other words, owners may have a non-conforming use on part of their property with an intent to extend the use to other parts, which will then have the same non-conforming status.   As an example, in *Union Cemetery Assn.*, an association used only a small part of its property for graves before its land was annexed by a city and then zoned for residential use.   *Id.* at 48.   However, the subsequent use of other parts of the land was allowed as an extension of the original nonconforming use.   *Id.* at 49.

{¶ 125} This concept is particularly relevant in the context of surface mining, where the "primary asset is the land itself, constantly diminishing through use."   *Torok v. Rubber City Sand & Gravel Co.*, 9th Dist. Summit No. 9136, 1979 WL 207680, *3 (June 13, 1979), citing *DuPage Cty. v. Gary-Wheaton Bank*, 42 Ill.App.2d 299, 302, 192 N.E.2d 311 (Ill.App.1963).   This point was mentioned during trial when a reclamation inspector employed by ODNR/DMRM stated that a standard part of mining operations is that property is held in reserve because mining, by its nature, exhausts the available resources as it proceeds.   Tr. at p. 334 and 367.

{¶ 126} In *Torok*, a landowner claimed a nonconforming use of three parcels of

land. Before a zoning resolution was enacted, mining had occurred on two parcels – the eastern and central parcels. The western parcel was separated from the central parcel by a railway and a river, and from the eastern parcel by a road. *Torok* at *1 and 5. After considering the majority and minority views on the subject, the court adopted the majority view, which was that "expansion of a diminishing assets business over the tract of land subsequent to enactment of the zoning ordinance or resolution does not constitute such an extension or enlargement of the use as to bring it under the zoning power." *Id.* at *2 and 4. The court therefore held that the landowner was entitled to have a non-conforming use for the entire property, "based on the integral role of the activities on the western section of the land in defendant's entire operation." *Id.* at *5.

{¶ 127} Previously, in *Davis v. Miller*, 163 Ohio St. 91, 126 N.E.2d 51 (1955), the Supreme Court of Ohio had held that "[w]here it is found that land owned by a person and bisected by a public highway comprises two separate and distinct parcels, one of which was used for the quarrying and crushing of stone before the enactment of a county zoning resolution prohibiting such activity, a determination that the other parcel, after the enactment of such zoning resolution, may not be devoted to such prohibited use is justified and proper." *Id.* at syllabus.

{¶ 128} *Torok* distinguished *Davis* on several grounds. The first point of distinction was that the zoning resolution in *Davis* referenced the nonconforming use of a "lot," and the property in *Davis* consisted of two lots, which the owner had treated as separate. In contrast, the language of the zoning resolution involved in *Torok* did not divide the owner's land into separate lots, the owner had treated the three lots as one parcel, the bridge over the river existed before zoning was enacted, and the landowner

had also obtained a licensing agreement to use the railroad crossing before the zoning ordinance was enacted. *Id.* at *4-5. Thus, despite the road, river, and railroad that separated the parcels, the property could be considered all one property to which a non-conforming use would properly be applied. *Id.*

{¶ 129} Similarly, in *State ex rel. Union Limestone, Inc. v. Bumgarner*, 110 Ohio App. 173, 168 N.E.2d 901 (3d Dist.1959), the court relied on the zoning definitions to conclude that the entirety of a 47-acre property on which a quarry was located, including non-conforming set-back lines, was one tract. *Id.* at 176. *See also Hauenstein v. W. Ohio Corp.*, 3d Dist. Allen No. 1-80-9, 1981 WL 6790, *2 (Feb. 18, 1981) (allowing a non-conforming use to extend to a second tract of land not currently being used for mining, where it was obviously purchased for use in mining before a zoning resolution eliminated mining from the listed uses of the property).

{¶ 130} Concerning non-conforming uses, the 1964 CCZR states that, "The lawful use of any dwelling, building or structure and of any land or premises, as existing and lawful at the time of the enactment of this resolution or any amendment thereto may be continued and subject to the provisions of this section." Joint Ex. I, Ch. 6, Section 6.07, at p. 11. The CCZR does not define "land," and the regulation is even more broad than the ones involved in *Torok* and *Bumgarner*. Consequently, there is no definitional barrier here for extending an owner's non-conforming use to another part of the owner's land, provided the other requirements for a non-conforming use are met. The question is whether the requirements were met. The trial court concluded they were not.

{¶ 131} Enon argues that it did produce evidence of the prior owners' intent to hold the property in reserve through the deposition of Daniel Demmy. However, as noted, the

trial court correctly refused to admit this evidence. The other evidence that Enon offered to show intent included historical aerial photographs and topographical maps depicting mining at varying locations and ODNR records showing the properties had been permitted for surface mining. Appellant's Brief at p. 33, referring to Ex. S through Ex. FFF.

**{¶ 132}** Before discussing these points, we note that for trial purposes, the property at issue did not involve the entire 420-acre property that Enon purchased in 2015. In contention were Parcel A (also identified as Demmy II), part of Parcel B (also identified as Keifer II), and Demmy III (a parcel on which Enon had an option and exercised it during the case). Parcel A consisted of five parcels: Parcel No. 18-23-0-0-001; Parcel No. 180-11-23-0-03; Parcel No. 180-11-29-0-007); Parcel No. 180-11-29-0-009; and Parcel 180-11-29-0-010 (individually "Parcel 1, Parcel 3, Parcel 7, Parcel 9, and Parcel 10"). Parcel B totaled 114.19 acres, and the area of alleged prior non-conforming use was the northernmost 26.86 acres.[8]

**{¶ 133}** The trial court noted that both sides had agreed that surface mining had taken place on Parcel Nos. 1, 3, 7, 9, and 10 before 1964. Decision Granting Injunction (Dec. 8, 2020), at p. 8. However, the court concluded that the evidence did not support

---

[8] The parties did not spend much time, if any, discussing "Demmy III," but it appears to be a 12.81 acre tract that was taken from Parcel I and that was also part of Parcel No. 5, which was not part of this litigation. *See* Ex. 1; Ex. A; Ex. B; Ex. MMM, ¶ 22 and 23 and Ex. F and G attached to Ex. MMM; and Ex. SSS at p. 1 and 2-3, and Ex. B and C attached to Ex. SSS. Consequently, when we discuss Parcel No. 1, it will also include Demmy III. As was previously noted, in 1964, the properties belonged to various owners, and the 1964 parcel boundaries show 17 different parcels that were ultimately combined into five parcels. *See* Ex. 4 and Ex. SSS, including Ex. G attached to that exhibit. The parties used the Demmy I, II, and III and Keifer I and II descriptions in the federal litigation. And, when the present case was tried, the parties used both the Demmy and Keifer labels, as well as Parcel A and Parcel B. Needless to say, the differing labels and numbers attached to these parcels at different times makes the record quite difficult to decipher.

a finding that surface mining took place on any of the parcels (Parcels A and B, and Demmy III) on November 3, 1964, except with regard to the 26.86 acre parcel in the northern part of Parcel B. *Id.* at p. 9. And, concerning this latter parcel, the court found that the "surface mining was abandoned and/or the uses were voluntarily discontinued for two years or more." *Id.* Thus, none of the properties had a prior lawful non-conforming use at the time of Enon's purchase.

{¶ 134} After reviewing the record, we agree with the trial court. There is virtually no evidence about any activity as of the specific date of November 3, 1964, which was when the CCZR was enacted. Furthermore, while there is agreement that mining occurred in Parcels 1, 3, 7, 9 and 10 at some unspecified points before 1964, there was specific evidence that no mining was going on in these parcels in 1964.

{¶ 135} For example, Ronald Parks was 19 in 1964 and lived in the immediate area of the properties. He stated that while he was growing up, there was no mining on Parcels 1, 3, 7, and 10. Parcel Nos. 1, 7, and 10 were pasture lands, and Parcel Nos. 1 and 10 were also wooded and had been a peony farm a long time before. Tr. at p. 81-83. Parks further stated that Woodrow Demmy (Daniel Demmy's father) ran a sand pit during the 1950s up through 1965, when Parks left the area. *Id.* at p. 89-90. However, that property is not involved in this litigation.

{¶ 136} Similarly, Wilma Goodbar, who was 20 years old in 1964, had lived in the area since she was three and still lived there at the time of trial. Goodbar stated that Parcel Nos. 3, 7, 9, and 10 were not being mined in 1964; these lands were farmland and some trees were on Parcel Nos. 3 and 10. *Id.* at p. 304-307. According to Goodbar, Woodrow Demmy was doing some mining on Parcel 1 in 1964, but Goodbar did not

specify any specific date.   *Id.* at p. 308.   Michael Verbillion, who was born in 1962 and lived in the immediate area, also said that during his lifetime, Demmy II, or Parcel A, had been farmland.   *Id.* at p. 286.   The only mining was on Parcel No. 5 (not part of the litigation).   Daniel Demmy only began mining on a part of Parcel 1 after Demmy purchased that parcel in the 1990s.   *Id.* at p. 288-290.

{¶ 137} The trial court chose to credit these witnesses or at least parts of their testimony, to find that no surface mining existed on Parcels 1, 3, 7, 9, and 10, as of November 3, 1964, and that, therefore, there were no prior, lawful, non-conforming uses for those parcels.   As indicated, we defer to the court's credibility decisions.   *Seasons Coal Co.*, 10 Ohio St.3d 77, 80, and fn. 3, 461 N.E.2d 1273.

{¶ 138} It is perhaps possible that surface mining existed on one or more of these parcels before 1964 and was not either discontinued or abandoned by the time the resolution was passed.   However, the evidence of record fails to confirm such facts.

{¶ 139} Consistent with our observation about the muddled nature of the record, we note that testimony about surface mining before and after 1964 was incomplete and vague as to specific dates, and had substantial gaps in time frames.   The testimony of the witnesses was also peppered with vague phrases like "in the 60's," "the early 60's," "in the mid-60's," "[s]ometime in the middle 60's," "in the late 80's," "in the 90's," "guesstimate," and so forth.   Tr. at p. 91, 206, 218, 222, 314, 439, 446, 456, 558, 461, and 563.

{¶ 140} It is true, as Enon notes, that during the state court action, both Clark County officials, Hale and Neimeyer, contradicted their federal court testimony. Previously, in federal court, they had testified that Enon had a prior lawful non-conforming

use for the property; in state court, they denied finding any evidence of this. Tr. at p. 160-161 and 403-412. Neimeyer's explanation in the state court action was that he had previously relied on what he was told by Hale and others. *Id.* at p. 161-162 and 178. Hale's explanation was that some confusion existed due to differences in maps and labeling and the fact that separate parcels had been tied together. *Id.* at p. 418, 421, and 476. However, the trial court did not need to rely on their testimony in light of the testimony from the other witnesses mentioned above.

{¶ 141} Furthermore, even though the parties agreed that a prior lawful non-conforming use existed on the relevant part of Parcel B before November 3, 1964, there was no indication that the use continued without any two-year lapses after that date.

{¶ 142} The 1964 CCZR states that "No building, structure or premises where a nonconforming use has been voluntarily discontinued for two (2) years or more shall again be put to a nonconforming use." Joint Ex. I, Ch. 6, Section 6.074, at p. 12. R.C. 303.19 contains a similar provision about non-conforming uses. Consequently, even if a non-conforming use existed, it would not be effective if the use were voluntarily discontinued for two years or more.

{¶ 143} Again, the testimony was so vague that a clear timeline of activity on Parcel B cannot be established. At trial, the parties stipulated to the chain of ownership of the parcels. *See* Joint Ex. VII, p. 1. The part of Parcel B that is alleged to have a prior non-conforming use is known as Keifer II. Keifer II belonged to various members of the Keifer family from 1935 to 1982, when it was granted to William and Rita Young. This parcel remained with the Youngs until 1992, when they granted it to Daniel Demmy, who ultimately transferred it to Enon in 2015.

{¶ 144} Kenneth Keifer was the grandson of Wilbur Keifer, who owned the land from 1935 until 1978. Joint Ex. VII at p. 7; Tr. at p. 556. Kenneth was born in 1952 and grew up about a half-mile from the gravel pit. *Id.* at p. 553-555. Kenneth was active off and on in the business until his grandfather died in 1977. *Id.* at p. 559.

{¶ 145} After Wilbur furnished aggregates to build the Springfield Air Base during World War II, Wilbur and his brother, Joseph, opened up a gravel pit on Keifer II to sell sand and gravel. *Id.* at p. 557. The land was transferred from Wilbur to Joseph in 1978, and in 1982, Joseph transferred the property to William and Rita Young. Ex. VII at p. 7. Keifer II was active until it was sold to the Youngs. *Id.* at 559. Kenneth could not recall any dates because he was not active in the business at the time; from 1977 to 1991, Kenneth did not work for anyone associated with Keifer II, until he came to work for Daniel Demmy for a few months in the summer of 1991. *Id.* at p. 559 and 571. At that point, he was working out of Keifer I. At some point (and it is not clear when), the operation had moved from Keifer II to Kiefer I because Keifer II was essentially mined out. *Id.* at p. 571.

{¶ 146} As noted, Ex. VII shows that the property was transferred by the Youngs to Demmy in 1992. *Id.* at p. 7. Consequently, the Youngs owned the property for about 10 years. Kenneth stated that he saw activity on Keifer I at some point during that time, but could not guess when that was. *Id.* at p. 573-575.

{¶ 147} Charles Swaney, who owned the property next to the Keifer II pit, stated that no gravel and sand had been taken from that area since the late 1970s. Tr. at p. 206-207. The operation had shifted to Keifer I, which was across the road. *Id.* The geological maps as well as the permit applications filed by the Keifers and Youngs

between 1977-1992 for Permit 340 (which included Keifer land but did not include Keifer II) also labeled Keifer II as an "abandoned quarry." *Id.* at p. 209-217, 351-356, 369, and 373; Exs. 28(a)-28(l); and Exs. S-EE. The applicant is the one who selects what is placed on the map. *Id.* at p. 357. There was also no mining permit for Keifer II between 1977 and the time of trial. *Id.* at 536. In other words, the Keifers did not include Keifer II when they applied for a mining permit after 1977, and listed Keifer II as an abandoned quarry. After the Youngs purchased the property, the maps they submitted yearly to the ODNR also listed Keifer II as an abandoned quarry, and, again, the mining permit did not include Keifer II.

**{¶ 148}** Based on the preceding discussion, we agree with the trial court that the non-conforming use of Keifer II was voluntarily discontinued for more than two years. There is simply no evidence otherwise, particularly with respect to the years that the Youngs owned the property. Consequently, before Daniel Demmy purchased the property in 1992, Keifer II no longer had the status of a non-conforming use, and it could not be resurrected based on Demmy's purchase and any subsequent mining on the property. Furthermore, to the extent that an argument might be made that the Keifers continued their non-conforming use of Keifer I by transferring their operation to Keifer I and then selling that property to the Youngs, who then sold to Daniel Demmy, there is simply no evidence that the Youngs did anything with respect to the property, or again, to show that they did not voluntarily discontinue the nonconforming use for more than two years.

2. Effect of Topographic Maps and Aerial Photographs

**{¶ 149}** Enon argues that the USGS aerial photographs and topographical maps that it submitted at trial and attached to its brief prove that mining had occurred on the subject properties long before the CCZR went into effect. Appellant's Brief at p. 33. *See also* Appendix III to the brief, which contains portions of Exs. G, G-1, N, N-1, O, O-1, H, H-1, P, P-1, K, K-1, Q, Q-1, R, and R-1. As an example of what these items show, Ex. G (an enlarged geologic map from 1955) contains notations of quarries on both sides of what appears to be Fairfield Road. Ex. N (an enlarged photograph from 1960) is an aerial photograph with no identifiers and no description of roads, etc. We assume Ex. G is intended to show the areas in question in this litigation.

**{¶ 150}** To begin, Enon's argument is somewhat misleading, because there was no dispute that surface mining had been conducted on Parcels A and B at some point before 1964. Decision Granting Injunction (Dec. 8, 2020), at p. 9. As a result, submitting maps and photos from dates before November 3, 1964 (Ex. G, G-1, N, N-1, O, O-1, H, and H-1) proved nothing relevant.

**{¶ 151}** More importantly, none of these exhibits were discussed at trial. Asking courts to interpret topographic maps and aerial photographs of unidentified landscapes without expert assistance or even any trial discussion of such items defies logic. As an example, Enon states, concerning Ex. K (a 1968 USGS topographic map apparently published in 1970), that "[t]he Court will note the multiple 'pick ax' symbols showing quarry operations." Appellant's Brief at p. 34. The legend on the map describes a few features, like the "unchecked" fact that "[f]ine red dashed lines indicate selected fence and field lines where visible on photographs." *Id.* at Ex. K. However, the legend says nothing about a "pick ax" symbol and what that might mean. And again, there was no

testimony on this subject at trial.   For these reasons, we reject any consideration of the topographic maps and aerial photographs and what they may or may not show.

### 3.   Establishment of a "Future Reserve" Through Daniel Demmy's Testimony

{¶ 152} Enon's next argument under this assignment of error is that Daniel Demmy's testimony revealed that he intended that all the property was either surface-mined or held in reserve for future mining.   Because we have already rejected the use of Demmy's former testimony, this argument is without merit.

### 4.   Proof of Intent to Abandon

{¶ 153} Enon's final argument is that Appellees failed to prove that either Enon or any prior owner had a manifest intention to abandon the non-conforming use.   In this context, Enon contends that non-use is insufficient without other evidence that indicates an intent to abandon the use.

{¶ 154} Courts have held that "to show a voluntary discontinuance of a nonconforming use, a party opposing the use must demonstrate that there has been a manifest intention to abandon the nonconforming use."   *Bd. of Trustees of Williamsburg Twp. v. Kriemer*, 72 Ohio App.3d 608, 612, 595 N.E.2d 945 (12th Dist.1991), citing *Bowling Green v. Sarver*, 9 Ohio App.3d 279, 459 N.E.2d 907 (6th Dist.1983). "Abandonment requires affirmative proof of the intent to abandon coupled with acts or omissions implementing the intent.   Mere non-use is not sufficient to establish the fact of abandonment, absent other evidence tending to prove the intent to abandon."   *Davis v. Suggs*, 10 Ohio App.3d 50, 52, 460 N.E.2d 665 (12th Dist.1983), citing *Kiser v. Bd. of*

*Commrs. of Logan Cty.*, 85 Ohio St. 129, 131, 97 N.E. 52 (1911). *Accord Hollingsworth Outdoor Advertising, Inc. v. City of Grove City*, 10th Dist. Franklin No. 91AP-661, 1992 WL 15946, *2 (Jan. 30, 1992).

{¶ 155} As a preliminary point, Enon's intent is irrelevant. Even Daniel Demmy's intent would be irrelevant, because the non-conforming use lapsed before he purchased either Keifer II or Keifer I. The evidence indicates that the Youngs, the prior purchasers, failed for more than two years to continue using the property for surface mining, classified the property as an "abandoned quarry," and did not attempt to obtain a mining permit for it. Accordingly, there was affirmative evidence of abandonment beyond non-use.

{¶ 156} Based on the preceding discussion, the fifth and sixth assignments of error are overruled.

## VII. Conclusion

{¶ 157} All of Enon's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

Brian P. Barger
Matthew D. Harper
Paul J. Kavanagh
Hon. Dale A. Crawford, Visiting Judge